THE PEOPLE *ex rel.* WM. C. STRATTON *v.* GEORGE OULTON, CONTROLLER OF STATE.

SALARY OF AN OFFICE.—The salary annexed to a public office is incident to the title of the office, and not to its occupation and exercise.

RIGHT OF OFFICER TO HOLD OVER.—The State Librarian holds over his office, after the expiration of his term, and until the election and qualification of his successor, by title, notwithstanding the law creating the office contains no provision authorizing him to do so.

SAME.—The above rule applies to civil functionaries whose duties consist in the safe keeping and current management of public property committed to their care and custody.

APPEAL from the District Court, Sixth Judicial District, Sacramento County.

This proceeding was commenced in the Supreme Court. The writ of mandate was applied for on affidavit and notice. The following are copies of the same:

STATE OF CALIFORNIA, } ss.
    County of Sacramento.

William C. Stratton, being duly sworn, deposes and says:

That during the twelfth session of the Legislature of this State, an Act was passed, "prescribing rules for the government of the State Library." Said Act was approved by the Governor on the eighth day of March, A. D. 1861.

The first section of said Act provides that "the State Library shall be under the direction and control of a Board of Trustees, to consist of five members, as herein provided. The Governor and the Chief Justice of the Supreme Court shall be ex officio members of the Board. J. R. McConnell, J. W. Winans, and S. Heydenfeldt, are hereby appointed members of the Board."

The fifth section provides that "the Board of Trustees shall have power to appoint a Librarian."

The seventh section provides, "that the Librarian appointed by the Trustees shall hold his office for the term of four years, and before entering upon the duties of his office he shall make and execute his bond to the State of California in the penal sum of three thousand dollars, for the faithful discharge of the duties of his office. Said bond shall be approved by the Governor, and shall be by him deposited in the office of the Secretary of State."

The sixth section provides, that "the Librarian shall receive for his salary the sum of two thousand five hundred dollars per annum. He may at any time be removed by consent of all the members of the Board of Trustees."

The seventeenth section provides, "this Act shall take effect from and after its passage."

That the Board of Trustees mentioned in the first section of the Act, held a meeting in the State Library rooms, on the 16th day of March, A. D. 1861, and at the meeting there held, this deponent was appointed Librarian by the said Board of Trustees for the term of four years, and this deponent executed his bond, and took the oath of office as required by law, and on the 17th day of March, A. D. 1861, he entered upon

the duties of the office of Librarian, and has continued to discharge the duties of said office continuously to the present time.

This deponent further showeth, that, on the 21st day of March, A. D. 1864, the Legislature passed an Act (which was approved on the day and year aforesaid) entitled : "An Act to amend an Act entitled an Act prescribing rules for the government of the State Library, approved March eighth, eighteen hundred and sixty-one," which amends the first section of the Act of March 8th, A. D. 1861, and provides, that " the State Library shall be under the direction and control of a Board of Trustees, to consist of five members, as herein provided. The Governor and the Chief Justice of the Supreme Court shall be ex officio members of the Board; J. F. Morse, J. W. Winans, and H. W. Harkness, are hereby appointed members of the Board."

That on or before the 30th day of December, A. D. 1864, the Governor appointed B. B. Redding a Trustee of the State Library to fill a vacancy occasioned by the resignation of J. F. Morse.

That on the 8th day of March, A. D. 1865, the Board of Trustees held a meeting for the purpose of electing or appointing a Librarian. There were present at said meeting, B. B. Redding, J. W. Winans, H. W. Harkness, and F. F. Low, the Governor of the State. The Board proceeded to vote for Librarian ; H. W. Harkness and J. W. Winans voted for this deponent, B. B. Redding and F. F. Low voted for J. L. Perkins.

That F. F. Low has exercised the office of Governor continuously for one year last past, and was on the said 8th day of March, and is still exercising the office of Governor, and that by section twelve of Article Five of the Constitution of this State, he is prohibited from holding the office of Trustee of the State Library while exercising the office of Governor, and by thus being incompetent to hold the office of Trustee of the State Library, his action as such and vote for Librarian was void, and this deponent having received a majority of the

votes of the legal Trustees of the Library, was, as he is advised and believes, duly appointed Librarian for the term of four years from the 17th day of March, A. D. 1865.

That this deponent executed his bond as required by law, which was presented to the Governor for his approval on the 16th day of March, A. D. 1865, and the Governor received and retained the same without objecting to its sufficiency, until the 30th day of March, A. D. 1865, when this deponent received a notice from the Governor. Said notice was dated March 28th, 1865, and informed this deponent that the Governor returned said bond without his approval, and in the following words declined to do so : " As you have not been re-elected by the Board of Trustees, I cannot recognize you as Librarian, and therefore cannot approve your bond."

That this deponent took the oath of office and entered upon and has discharged the duties of Librarian from the said 17th day of March, A. D. 1865, to the present time.

That no other person has claimed the office of Librarian, and this deponent is justly entitled by virtue of his appointment as aforesaid, and the performance of the duties of the office, to the salary allowed the Librarian by law.

That the sum now due this deponent as Librarian, is one hundred dollars and eighty cents, for salary from the 17th day of March, A. D. 1865, to the 31st day of March, A. D. 1865.

That the Legislature of the State passed an Act which was approved by the Governor on the 4th day of April, A. D. 1864, entitled " An Act making appropriations for the support of the civil government of this State for the sixteenth and seventeenth fiscal years, commencing on the first day of July, A. D. eighteen hundred and sixty-four, and ending on the thirtieth day of June, A. D. eighteen hundred and sixty-six."

Section first of said Act appropriates the sum of five thousand dollars out of any money in the Treasury not otherwise appropriated for the salary of the State Librarian, from the 1st day of July, A. D. 1864, to the 30th day of June, A. D. 1866.

That the salaries of officers of State are by law due and

payable on the last day of each month, and it is the duty of the Controller to draw his warrant for the same on the last day of each month. (Laws, 1863, p. 235.)

And this deponent further says, that on the last day of March, A. D. 1865, he demanded of George Oulton, Controller of State, that he, said Controller, should draw his warrant on the Treasurer of State in favor of this deponent, for the sum of one hundred dollars and eighty cents, the amount due this deponent for his salary as Librarian from the 17th to the last day of March, A. D. 1865.

And this deponent further says, that on said last day of March, when the said demand was made upon the said Controller, there was a large amount of money in the State Treasury not otherwise appropriated by law, out of which the statute authorizes the appropriation in question to be made, and subject to be applied to the payment of the warrant demanded of the Controller by this deponent; but the said Controller, in violation of the clear legal rights of this deponent, as this deponent is advised and believes, and of his, the said Controller's plain duty in the premises, unjusly refused and still refuses to draw said warrant for said sum or any part thereof.

And this deponent says further, that he is advised and believes that for the wrongful refusal of the said Controller to draw the said warrant, there is no plain, speedy, and adequate remedy in the ordinary course of law.

Therefore, plaintiff prays that the above named George Oulton, Controller, the defendant in this action, may appear in this Court, and answer this complaint, and show why a peremptory writ of mandamus shall not issue, requiring him to draw his warrant on the Treasurer of State in favor of the plaintiff for the sum of one hundred dollars and eighty cents, for this plaintiff's salary as Librarian, from March 17th to March 31st, A. D. 1865, and that the Court will award a writ of mandate requiring and commanding said Oulton, Controller aforesaid, to issue said warrant.

WILLIAM C. STRATTON.

*To the Honorable George Oulton, Controller of the State of California:*

SIR:—You will please take notice that on Tuesday, the 11th day of April, A. D. 1865, or as soon thereafter as counsel can be heard, I shall apply to the Supreme Court of the State of California to issue a peremptory mandamus commanding you, that, as Controller of the State of California, you do forthwith draw your warrant on the Treasurer of the said State, in favor of William C. Stratton, for the sum of one hundred dollars and eighty cents, due from the State of California to said Stratton, for his salary as State Librarian, from the 17th to the 31st days of March, A. D. 1865.

The said application will be founded upon the affidavit of William C. Stratton, a copy of which affidavit is herewith served.

WILLIAM C. STRATTON.

The defendant demurred to the complaint. The case was submitted on complaint and demurrer.

*Wm. C. Stratton,* in *pro. per.,* for the Relator.

It is admitted that in most cases an information in the nature of a *quo warranto* is the proper proceeding to try the title to an office; but in case of an application for a writ of mandamus by an officer to compel the Controller to draw his warrant, if the refusal be on the grounds that the person claiming the salary is not an officer, " the title to the office is directly in issue and is the only material fact in the case." (*People* v. *Tieman,* 30 Barb. 196.)

The plaintiff here desires to institute no direct proceedings for the purpose of testing the right of Governor Low to hold the office of Trustee of the State Library. But deeming himself the duly qualified State Librarian, he invokes the power of the Court for the purpose of compelling the Controller to draw the warrant for his salary.

If Stratton was not elected Librarian on the 8th of March, 1865, although his former term expired on the sixteenth of the

7

same month, he, must continue to hold the office until the Trustees appoint a Librarian to take charge of the office. (*McCall* v. *Byram Manufacturing Co.*, 6 Conn. 428 ; *Spencer* v. *Champion*, 9 Conn. 536 ; *Bethany* v. *Sperry*, 10 Conn. 200.)

He is not a usurper, as his original possession was by authority of a legal appointment. The possession of the office of Librarian is possession of the books and property of the library, for which he is responsible. He cannot resign, nor can he lawfully abandon the office, but must continue to hold possession until he can deliver it up to some person legally appointed Librarian by the Trustees.

The Act provides that the Librarian appointed by the Trustees shall hold his office for the term of four years. The Act does not provide that the Librarian shall hold his office until his successor is appointed ; but if the Trustees, who can act at any time, and who have the direction and control of the library, refuse to appoint a successor, and by such refusal compel the incumbent to continue in charge of the office, it is a reasonable construction that he is not a usurper, but is legally holding over as Librarian, and is entitled to the salary allowed the Librarian by law.

The theory of the Constitution and statute law is that officers must hold over until their successors are qualified to relieve them ; and it certainly could not have been the intention that so important an institution as the State Library should remain without any person to take charge of it.

The Act provides that the Librarian may at any time be removed by consent of all the members of the Board ; and Stratton, after being once duly appointed, must be considered the legal incumbent by consent of the appointing power, so long as the Trustees neither appoint another person nor remove him, as provided by law.

*J. G. McCullough*, *Attorney-General*, for Defendant.

By the Court, SHAFTER, J.

Stratton, the applicant in this proceeding, prays the Court that a peremptory writ of mandamus may be awarded, requiring Oulton, the State Controller, to issue his warrant on the Treasurer for the sum of one hundred dollars and eighty cents, due for the applicant's salary as State Librarian, from the 17th to the 31st days of March, 1865.

Stratton was duly appointed State Librarian in March, 1861, and his term of office, assuming that he could under no circumstances hold it more than four years by virtue of that appointment, expired on the 16th of March, 1865.

At a meeting of the Board of Trustees, held on the 8th of March, 1865, for the purpose of electing a Librarian, three of the five Trustees named in the Act of 1864 and the successor of another Trustee named therein, were present. Two of the four, Winans and Harkness, voted for Stratton, and the other two, Governor Low and Redding, voted for Perkins.

Since the 16th of March, Stratton has had the custody of the library, and has performed all the duties connected with the office of State Librarian.

The applicant claims that he is Librarian *de jure.* He could do no less, for the salary annexed to a public office is incident to the title to the office and not to its occupation and exercise. (*People ex rel. Dorsey* v. *Smyth*, County Auditor, 28 Cal. 21.) In aid of his alleged right to the office of Librarian, the applicant insists, first, that he was elected to the office at the meeting of the Trustees on the 8th of March—inasmuch as the vote of the Governor against him was a nullity, the Governor having, as is claimed, no power to cast a vote in view of the twelfth section of the Fifth Article of the Constitution; and if not so elected, then the applicant further insists, that he holds the office by title until his successor shall be duly elected and qualified. Both of these propositions are controverted by the respondent; and, for the purposes of this decision, the first of the two may be considered as fallacious. This not only narrows the ground covered by the applicant in argument, but

does away with the objection stated by the respondent, that the validity of the vote cast by the Governor cannot be gone into in this proceeding. As thus disburdened, the case presents but a single question : Does the applicant hold over under his appointment in 1861 in the absence of a statute provision authorizing him to do so ?

In the case of *Foot* v. *Prouse*, Mayor of Truro, 1 Strange, 625, it appeared that the Mayor was to be chosen out of the Aldermen, who were themselves to be elected annually. The Aldermen present at and participating in the election of the plaintiff had been in office several years, and none of them had been re-elected within a year. On a bill of exceptions, the Court was of the opinion that the election of the plaintiff was void for want of an annual election of the Aldermen. But upon error in the Exchequer Chamber, and two solemn arguments, the judgment was reversed ; and it was held " that the words ' to be annually elected ' were only directory, and that an annual election of Aldermen was not necessary to make an election of Mayor in their presence good ; and King, C. J., *de* C. B., who delivered the opinion of the Court, compared it to the case of a Constable and other annual officers who are good officers after the year is out and until another is elected and sworn. The reversal was affirmed in Parliament."

In *The Queen* v. *The Corporation of Dunham*, 10 Mod. 146, it was considered that "a Town Clerk, to be elected annually, would continue Town Clerk until the election of his successor."

In the *Anonymous Case*, 12 Mod. 256, it is said "a Constable is not discharged until his successor is appointed and sworn in ; because the parish cannot be without an officer."

It was held in *McCall* v. *Byram Manufacturing Company*, 6 Conn. 427, Mr. Chief Justice Hosmer delivering the opinion, "that the Secretary of a corporation appointed in January, 1823, for the ensuing year, and continuing to act as such after the year had expired, was, by virtue of the legal construction of his appointment, Secretary *de jure*." That "it was a well settled principle that an annual officer continues until superseded by the appointment of another in his place. The time

when such an appointment is to be made is considered as directory and not imperative." It was admitted that "a statute or by-law, or even an appointment, might be so restrictive, by the expression or implication of a negative, as to terminate an annual office at the end of the year. But the election to an office for a year has never been considered of this description. Such are the appointments to town offices; but the persons appointed continue indefinitely until the incumbent's place is supplied."

In *Spencer* v. *Champion*, 9 Conn. 536, it appeared that the charter of a manufacturing company, under which the plaintiff claimed by levy of execution, provided that the affairs of the corporation should be managed by a Board of Directors who should hold their offices for one year and should be annually elected. The question was whether Directors, elected under the charter, could hold over *de jure;* and it was held that "an annual officer, there being no restrictive provision in his appointment, holds his office until the appointment of another in his place."

In *Bethany* v. *Sperry*, 10 Conn. 200, the whole subject was learnedly reviewed on principle and authority, and the doctrine of the above cases was reaffirmed. In *People* v. *Runkle*, 9 John. 148, the Court acquiesced in the English decisions cited, as correct expositions of the rule of the common law; and that conclusion received the sanction of Chancellor Kent in *Slee* v. *Bloom*, 5 J. Ch. 377. And in his Commentaries (Vol. 2, p. 295), the learned author, giving his conclusions as a jurist, considers "the sounder and better doctrine to be, that where the members of a corporation are to be annually elected, the words are only directory, and do not take away the power incident to the corporation to elect afterwards." And it was held in *Wier* v. *Bush*, 4 Litt. 434, that the words would be regarded as directory, unless the implication was displaced by "negative expressions."

The Attorney-General cites *The People ex rel. Morton* v. *Tieman*, 30 Barb. 193, as being opposed to these decisions. But the point now in question did not arise in that case; for it

appeared that the Act under which the relator was appointed City Inspector had been repealed, and therefore it was unnecessary to inquire whether the relator would have held over or not if the Act had not been repealed. The opinion, in so far as it bears upon the question, is *obiter dictum*, and cannot be considered as reversing the rule in New York as established by *The People* v. *Runkle* and *Slee* v. *Bloom*. It is suggested in the opinion in 30 Barbour that the instances in which officers have been held to hold over by right until the appointment and induction of their successors, have been limited to officers and agents of private corporations or to subordinate agents and officers of municipal corporations. But inasmuch as Morton was a subordinate officer of a municipal corporation, and inasmuch as the Court, or, rather, the Judge who wrote the opinion, held, nevertheless, that he would not have held over on any known principle of common law in the event the Act creating the office of Inspector had been on foot, it follows that the cases, both at home and abroad, establishing the contrary to be the rule, were not considered as correct expositions of the common law. But those decisions nowhere limit the operation of the rule to the subordinate or inferior officers of municipal corporations; and it is conceived that a distinction that should make the operation of the rule to depend upon official grade could be referred to no intelligible principle. The case cited from the 12th Mod. illustrates the ground of the rule. (A Constable holds over, not for the reason that he is a subordinate officer, but " because a parish cannot be without an officer.") By this it is not meant that a parish when it loses its Constable ceases to be a parish, for that is not true, as matter of law (5 Com. Dig. 180) ; but that a parish without a Constable would fail in one of the ends to which it is appointed. The ground of the rule then is public necessity ; and if the public welfare would be endangered if subordinate officers in a municipal corporation could not hold over until their successors were appointed and qualified, *a fortiori*, would it be endangered if the chief officers were to be

considered as out of office by limitation, before others were, appointed to whom they could safely resign their trusts.

Officers of public corporations are themselves as public as the corporations to which they belong. Such corporations and all official positions in them, are created either directly or indirectly by the Government, and for public political purposes only. To say that a man is an officer of a public corporation is to say that he is a public officer in the largest sense. He may be limited in the exercise of his powers to a particular locality, but his position and powers are, in the matter of essential quality, as public as those of an officer of the highest station. And, therefore, should it be considered that the distinction stated in *People* v. *Tieman*, for the first time, was well taken, it may well be insisted that Stratton, as Librarian, is a " subordinate officer," or rather a mere ministerial agent of a · public corporation of largest magnitude, charged, as such, with the custody and care of corporate property. Such, then, being the Librarian's character and relations, he holds over under the limitations put upon the common law rule in the case cited for the respondent; and, in addition to that, it is perfectly manifest that the office of State Librarian is within the principle upon which the rule of the common law proceeds.

If Stratton is not now in custody of the library by right, to whom does its custody rightfully belong? If he is not " bound to be constant in attendance upon the library during the hours it shall be directed to be kept open " (Act 1861, p. 46, Sec. 9), upon whom does that obligation rest? Who, if not he, is bound to act " as Secretary of the Board of Trustees and to keep a correct record of its proceedings ? " Who, if not he, " is responsible for the safe-keeping of the books ? " Section fourteen requires " that the library shall be kept open every day of the year, Sundays excepted, during such hours as the Trustees may direct." Who is at once authorized and bound to fulfil this command if Stratton is not? If he is a naked usurper, as is contended, then he does not rightfully control the approaches to the library—and if he enters it as

Librarian it is only by usurpation of that character. If he holds the key lawfully, it is merely as ᵛdepositary, having no powers and no duties with respect to it, except to keep it safely in his own possession until called upon by the Trustees or his successor to surrender it. On this view of the law we have not only a library without a Librarian, but a library suspended as to all the uses for which it was established; and not only are citizens barred of lawful access to it during the alleged interregnum, but the Governor also, and every officer of the Executive Department, and the Justices of the Supreme Court. All of which, in effect, comes to this: that the State has lost the right to use its own books *die in diem*, while the present condition of things shall continue to subsist.

The rule of the common law, as settled by the cases cited, conserves the public good by conserving the methods and instrumentalities by which alone public business can be transacted; while the opposite rule, when pushed to its consequences, might result in a suspension of business in every department of the public service. We do not decide, nor would we be understood as holding, that the rule of the common law would extend to members of the Legislature, or to judicial officers, or to the Executive. They may be without the mischiefs which the rule was intended to forestall. But as to the State Librarian, and other civil functionaries like him, the sum of whose duties consists in the safe keeping and current management of public property committed to their custody, they, in our judgment, are broadly within the rule and its reason. If Aldermen, whose duties are legislative in the main, are within it, a mere custodian·and manager of a public library must be.

It is urged in the learned argument filed by the Attorney-General that, inasmuch as the Act of 1863, "concerning offices" (Acts of 1863, p. 386,) provides that certain officers, some of whom hold by constitutional and others by statute tenure, shall hold until their successors are elected and qualified; and inasmuch as the Act creating the office of State

Librarian contains no such provision, the common law rule is constructively negatived as to him.

The Acts are not *in pari materia.* The subject matter of the Act of 1863 is confined to the offices and officers therein named, and the subject matter of the Act of 1861 is made up of other and distinct offices and officers. If the office of Librarian and its tenure, had been included in the Act of 1863 as a portion of its subject matter, and a holding over in the matter of that office had been omitted, the maxim *expressum facit cessare tacitum* might have applied. But as between two detached and independent statutes without a common subject matter in any exact sense, the maxim has no application. The question, then, comes to this: Did the Legislature in passing the Act of 1861 negate the rule of the common law by omitting to restate it? Certainly not in the judgment of the tribunals by which the cases previously cited were determined, otherwise the very point decided could not have arisen. But the question was directly presented in *Bethany* v. *Sperry*, 10 Conn. 206, already cited, and it was held that the fact that it was expressly provided that the society clerks should hold over, while the Act was silent in that particular as to the other society officers did not necessarily argue that a holding over by them was intended to be forbidden. (Smith's Com. 655.) There the legislation as to the clerk and the other society officers was not only in the same Act but in one and the same section.

We consider the constitutional provision that the Governor, Lieutenant-Governor, Secretary of State, Attorney-General, and Surveyor-General, shall hold their offices until their successors are respectively elected and qualified, as a most impressive recognition of the policy upon which the rule of the common law proceeds; and the Legislature has given the largest countenance to it, by the Act of 1863, and by other Acts relating to civil officers.

Reference is made, on behalf of respondent, to *Miller* v. *The Board of Supervisors of Sacramento County*, 25 Cal., and *People*

*ex rel. Dorsey* v. *Smyth*, 28 Cal. 21.　Neither of those decisions, as we conceive, bears upon any point raised in this proceeding. The writ moved for is awarded.

Mr. Chief Justice SANDERSON expressed no opinion.