No. 15,912.

## THE STATE, EX REL. WORRELL, *v.* CARR, AUDITOR.

OFFICE AND OFFICER.—*Officers de facto and de jure.*—*Salary.*—Where a *de facto* officer assumes to retain the office after the qualification of the officer *de jure* and continues to discharge its duties, a payment of salary to such *de facto* officer by a disbursing officer of the State, with full knowledge of the invalidity of the *de facto* officer's title, is no defence to an action for the salary by the officer *de jure*, who has also discharged the duties of the office.

APPROPRIATION.—*For Salary.*—*Constitutional Law.*—In an act appropriating money to pay the salary and expenses of a certain office, a provision that it shall be paid to a certain person named and none other, is unconstitutional and void as attempting to adjudicate as to who is the legal officer entitled to the salary.

From the Marion Circuit Court.

*A. J. Beveridge, L. T. Michener, A. C. Harris, J. H. Gillett, F. H. Blackledge, L. M. Campbell* and *E. G. Hogate,* for appellant.

*A. G. Smith,* Attorney General, *L. O. Bailey* and *P. Daniels,* for appellee.

OLDS, J.—The relator filed his petition in this case, asking that a writ of mandate issue against the appellee, the auditor of State, compelling him to draw his warrant on the treasurer of State in favor of the relator for the sum of $2,500, the amount alleged to be due the relator as his salary as chief of the Indiana Bureau of Statistics.

Issues were joined on the complaint, and a trial had. There were demurrers filed to the paragraphs of answer, and overruled, and exceptions reserved. Errors are assigned on these rulings. On proper request there was a special finding of facts and conclusions of law stated by the court. The conclusions of law were excepted to by the appellant, and a proper assignment of error made thereon.

The questions presented and discussed relate to the right of the relator to the salary alleged to be due him, and his

right to have a writ of mandate issue compelling the auditor of State, the appellee, to draw his warrant on the treasurer of State in favor of the relator for the sum due him. No question is presented and discussed as to the regularity of the proceedings, or as to the proper parties being before the court.

The facts found by the court show that on the 31st day of May, 1889, the relator, John Worrell, was appointed and commissioned chief of the Indiana Bureau of Statistics, by Alvin P. Hovey, Governor of the State of Indiana; that at the time of his appointment he was a resident voter of the State, of legal age, and in every way eligible to hold the office, and on the day of his appointment he took the oath of office, which was indorsed on the back of his commission, and filed a copy thereof in the office of the secretary of State, and in every way qualified as such officer, and on the same day appellee was notified of the relator's appointment and qualification; that after the relator's appointment he applied for office room in the State Capitol, to be occupied by him as the chief of the Indiana Bureau of Statistics, and was assigned a room for that purpose by the auditor of State, which room was independent and removed from a room occupied by William A. Peelle, Jr., and said relator, Worrell, has been doing work and performing the duties of the chief of the bureau of statistics, independent of work performed by said Peelle, from May 31st, 1889, to November 19th, 1890.

At the time relator Worrell was appointed, commissioned, and qualified as chief of the Indiana Bureau of Statistics, said office was held and occupied, and the duties thereof were being performed, by one William A. Peelle, Jr., a person who was eligible to fill the office, who held said office under and by virtue of an election thereto by the Fifty-third, Fifty-fourth, and Fifty-sixth General Assemblies of the State of Indiana, and was commissioned under said first two elections by Governors Porter and Gray, which commissions set out the elections and certified thereto; that Governor Hovey re-

fused to issue to said Peelle a commission under the election of said Peelle to said office by the Fifty-sixth General Assembly; that Peelle claimed and had no other title to said office, except as herein above found, said office being vacant except as so occupied and claimed by Peelle and Worrell.

The findings further show that Worrell demanded of Peelle possession of the office immediately after his appointment and qualification, and Peelle refused to surrender it, and that Worrell immediately commenced *quo warranto* proceedings against Peelle for the possession of the office, which were twice appealed to the Supreme Court, and reversed, and were not disposed of until after the State election in 1890, at which election Peelle was duly elected to said office, and was commissioned by the Governor, and qualified as such officer, and on Peelle's motion, supported by proof of his election, the *quo warranto* proceedings were dismissed; that during all of the time Peelle continued to occupy the appartments as he had previous to Worrell's appointment, and retained the archives of the office, collected information and made records the same as he had done prior to Worrell's appointment; that the salary of the chief of the bureau of statistics is $1,800 per year, and there is money in the treasury of the State of Indiana subject to be paid out on warrants of the auditor of State, for the payment of the salary of said chief; that relator has, prior to the commencement of this suit, demanded of the appellee that he draw a warrant in relator's favor for this salary, and since November 4, 1890, he has made demand upon the appellee that he draw such warrant for the sum of $2,550, said sum to be paid to him as salary from May 31st, 1889, to November 1st, 1890, and presented itemized and qualified bills therefor, as required by law, and appellee has refused to draw such warrant; that on October 31st, 1889, appellee drew his warrant on the treasurer of State in favor of William A. Peelle, Jr., demand having been made by said Peelle for the sum of $750 as salary, or by way of compensation as chief of the Indiana Bu-

reau of Statistics, from May 31, 1889, to November 1, 1889 ; otherwise said appellee has not drawn his warrant on the treasurer of State in favor of any person for the salary of said office.

There is a further finding in regard to the provision of the laws appropriating the amount of the salary of such office, and a provision that it should be paid to Peelle as such chief.

On the foregoing facts the court stated, as a conclusion of law, that relator was not entitled to a writ of mandate, as prayed in his petition.

The act of the Legislature, approved March 29th, 1879, creating a State bureau of statistics, made it the duty of the bureau to collect, systematize, tabulate, and present in biennial reports, statistical information and details relating to agriculture, manufacturing, mining, commerce, education, labor, social and sanitary condition, vital statistics, marriages and deaths, and the permanent property of the productive industry of the people of the State. The first section of this act provides that the department is established for the collection and dissemination of information hereinafter provided, by biennial printed reports to the Governor and Legislature of the State, and it provides for the appointment of the chief by the Governor. Acts of 1879, p. 193.

Some amendments have been made to this act. By an act passed in 1883 (Elliott's Supp., section 1852), an attempt was made to change the method of selecting the chief, and provide for his election by the General Assembly, and by an act in 1889 (Elliott's Supp., sections 1854 to 1862, inclusive), some additional duties were added, and it was made the duty of the chief to transmit one copy of the biennial report to each county and State officer. The duty of the bureau is to gather such information as is required by the law, systematize it, and publish it in proper printed reports, and to disseminate such information by printed reports of all such information collected, and distributing them to the Gov-

ernor of the State, the General Assembly, and to each State and county officer of the State. There is no law providing that any public records shall be kept of such information save the printed reports. The benefits to be derived on account of such a bureau is through the publication and distribution of the biennial reports. It is provided that headquarters for the bureau shall be furnished by the State.

The findings of fact show that the relator, Worrell, had been assigned and provided office-rooms by the auditor of State in the State-house. There was nothing to prevent him from discharging the duties of the office, collecting and systematizing the information contemplated by the law, and publishing the same in printed reports, and distributing them with the same efficiency and to the same extent as if Peelle had surrendered the apartments occupied by him previous to that time ; and the findings of fact show that Worrell did discharge the duties of the office in compliance with the law. It is true, there is a finding that Peelle was in possession of the archives and records of the office. What the archives and records were that he was in possession of, the findings do not show. The law makes no provision whereby such officer is required to keep any public records or anything else to be kept in connection with and belonging to the office, there to remain as the property of the State, which the outgoing officer would be required to turn over to his successor. The findings of fact show that Worrell was eligible to the office ; that he was duly appointed, commissioned, and qualified as such officer ; that the appellee, the auditor of State, had notice at the time of his appointment and qualification ; that he made application to the auditor of State for apartments, and the auditor of State assigned him apartments for headquarters of the bureau ; and that he occupied them, and discharged the duties of the office. It is further found that Peelle retained the apartments formerly occupied by him, and continued to act, or assumed to act, as chief, and collect information

the same as he had done before; but the findings show that he had no title to such office, except through a pretended election by the General Assembly. In the adjudication in the *quo warranto* proceedings the main question in this case was settled by the decisions of this court on appeal. *State, ex rel.*, v. *Peelle*, 121 Ind. 495, and *State, ex rel.*, v. *Peelle*, 124 Ind. 515.

By these decisions, between these same parties, the law was settled that the statute authorizing the election of a chief of the bureau of statistics by the General Assembly was unconstitutional and void, and that the election and commission of Peelle gave to him no title to the office, and that the Governor was authorized to appoint to fill the vacancy until the office was filled by an election. Under these decisions, the facts found in this case show that Worrell was, during the time from his appointment and qualification, up to the date of the election and qualification of Peelle as his successor, the *de jure* officer; not only the *de jure* officer, but in possession of, and discharging the duties of, the office. When he was appointed by the Governor, and qualified, he became the *de jure* officer; and when he was assigned quarters by the auditor of State in the State Capitol, to occupy as headquarters for the bureau, and discharge the duties of the office, he was equipped in full to discharge all the duties incident to the office, and he did discharge the duties from thence forward until his successor was elected and qualified. Being a *de jure* officer, and in possession of, and discharging the duties of the office, under all the authorities he is entitled to the salary. Indeed, the later and better reasoned cases hold that the salary is an incident to the office, and belongs by law to the person holding the legal title to the office, and that he can sue and recover it regardless of the fact whether he is occupying and discharging the duties of the office or not, if he be willing to do so, but is kept out by another who is claiming to act as an officer *de facto*.

The State, *ex rel.* Worrell, *v.* Carr, Auditor.

This would seem to be the true theory, though it is not necessary to go to that extent in this case, as, under the facts found, Worrell was not only the *de jure* officer, but was, in fact, in possession, and discharging the duties of the office during the time for which he claims salary. It is true, the State and the public are interested in having a public office filled; and when one holds an office, though without title, and acts as an officer *de facto*, and keeps out the *de jure* officer, and while so in possession discharges the duties of the office, the public good demands that the acts of such *de facto* officer, in so far as they affect third parties or the public, be declared valid; but there is no valid reason for declaring that, as between the *de jure* and *de facto* officer, the *de facto* officer is entitled to the salary, or that he, by excluding the *de jure* officer, can prevent him from receiving the salary, or for holding that where one charged with the duty of paying the salary, when with knowledge of all the facts he pays to the *de facto* officer, he shall be relieved from paying to the *de jure* officer. The disbursing officer can not be sued or compelled to pay a *de facto* officer. When the *de facto* officer sues for his salary he brings in question the title to the office, and he can not recover without establishing his legal right and title to the office. To hold that payment by a distributing officer to a *de facto* officer exonerates him from liability to the *de jure* officer for the salary, but stimulates irresponsible persons to cling to an office without even a shadow of title, and exclude the lawful occupant, with a view of recovering the salary of the lawful occupant to the office; but under the facts in this case we are not required to go to the extent of holding that the *de jure* officer, out of possession, can recover his salary notwithstanding another is occupying and discharging the duties of the office as an officer *de facto;* for in this case the facts found show Worrell to have been an officer *de jure*, in possession of the apartments assigned to him by the proper officer, the auditor of State, and discharging the duties of the office, so that the

headquarters of the bureau of statistics of the State of Indiana were, both in law and in fact, in the apartments in the Capitol building set apart for occupancy by Worrell, the legally appointed, commissioned, and qualified chief of the bureau of statistics; and, as it seems to us, it would be a travesty on justice to hold that Worrell, under such a state of facts, could be prevented from recovering his salary, or that the auditor of State could refuse to draw a warrant, or the treasurer of State refuse to pay a warrant for his salary, notwithstanding Worrell is the lawful officer in possession; but on account of Peelle continuing to occupy rooms theretofore occupied by him, and to gather statistics, after it has been held by the Supreme Court of the State that the law under which Peelle claims to have been elected is unconstitutional and void, and the commissions issued in pursuance of such election gave him no title to the office. Indeed, the facts found show that Peelle terminated the *quo warranto* proceedings by abandoning any claim to the office by virtue of his position, and the election by the General Assembly, and set up his title to the office by virtue of his election by the people, and his commission and qualification, dismissing the case upon the grounds that after his election and qualification he was the legal chief of statistics, and no judgment or ouster could be rendered against him. The appellee had full knowledge of Worrell's appointment and qualification; he assigned him apartments to occupy as such officer; he knew that he was in possession of the office, as he had assigned him the apartments in the State Capitol which he occupied. Worrell is entitled to recover the full amount of his salary, and to have a warrant drawn on the treasury by the auditor of State for the amount, unless the provision of the law naming Peelle as the chief, to whom the salary is to be paid, prohibits the payment to the legal officer, and this we will now consider.

As we have seen, Peelle was not the legal officer, and Worrell was the legal officer, in possession of the office, dis-

charging the duties of the° office. The proposition contended for is that, notwithstanding Worrell was the legally appointed and qualified officer, discharging the duties of the office for which a salary is fixed, and to which the legally qualified officer is entitled as an incident to the office, the Legislature can make an appropriation to pay the salary which Worrell has earned, and to which he is entitled, and, without any legal authority to do so, name Peelle as such officer, chief of the bureau of statistics, and appropriate an amount to pay the salary of the chief, and provide it should be paid to Peelle, and none other; and such a clause in a law would be valid, providing for the payment to Peelle of the salary earned by and due to Worrell. The statement of the proposition carries with it the fallacy of it. That such a provision is invalid seems too clear to admit of discussion. It is directly appropriating a salary due to one, and which is the property of one, for the benefit of another.

By an act of the General Assembly, approved March 11th, 1889, there is appropriated " For all of the expenses of the bureau of statistics, authorized by law, including the salary of the chief of said bureau, of all assistants, all travelling and office expenses, including all blanks, stationery and postage, to be paid out on the itemized and qualified bills of the chief of the bureau of statistics, eleven thousand dollars; for the year ending October 31, 1889, the sum of four thousand dollars." Stopping with this provision of the law, no complications could arise. It expressly provides that the several sums shall be paid out " on the itemized and qualified bills of the chief." But there follows in a separate clause of the act a provision in the law providing that " the several sums so appropriated by this act for said bureau of statistics shall be paid to William A. Peelle, Jr., chief of said bureau, elected by this General Assembly, or to his successors in office appointed pursuant to an act of the General Assembly, in case of the death, removal from the State or resignation of said William A. Peelle, Jr., and to no other person or persons."

It is evident that this provision was inserted in the law, not with a view to paying the salary to Peelle, regardless of the fact as to whether he was the legal chief of the bureau or not, for the appropriation is made with a provision that it shall be paid out on the itemized account of the chief. The clause relating to Peelle evidently was inserted upon the theory that he was the legal officer. Certainly, no legislative body would so far forget its duties and obligation to the State as to endeavor to elect an officer without authority of law, and endeavor to forestall any effort on behalf of the legally elected officer to recover the office, or discharge its duties by placing the appropriation in such condition that the salary belonging to the legal officer, and incidental expenses of the office, could not be recovered by the legally elected or appointed and qualified officer. To hold that the General Assembly intended to provide that the person chosen by the General Assembly should hold the office, right or wrong, and should receive the salary, or, at least, that no other person, though legally entitled thereto, should receive the salary or draw the sum so appropriated for running such office and department of the government, would be attributing improper motives to its members. Courts should not impugn the motives of legislators ; and it would be impugning their motives to hold that they intended, by the provisions of this law, to declare that the person the General Assembly elected to this office should have the salary and draw the amount appropriated, though the election is illegal, and he may have no right to the salary or the money, notwithstanding another has been lawfully elected, or appointed, and qualified, and become the lawful chief of said bureau. Certainly, such was not the intention of the Legislature, and the act would be absolutely void if it was. The legislative department has the right, and it is its duty, to make appropriations for the payment of salaries, and the expense of running the various departments of the State government.

Whether salaries might not, in some instances, be recov-

ered without an appropriation, is not necessary to decide, but it is certain that there is no authority to go through the formality of electing an officer to an office then in existence, though the election be void, and appropriating funds to pay the salary of the legal officer, and providing that such sum should be paid to the officer having no title to the office. To enunciate such a doctrine would be to hold that the Legislature might convene and choose persons to fill all of the State offices, and appropriate money to pay the salary of the legal officer, and then declare that in such instances it shall be paid to the person so chosen by the Legislature to fill such office, and to none other.

The Constitution provides that no person charged with official duties, under one department of state, shall exercise any of the functions of another. Article 3, section 1. The part of the law making an appropriation to pay the salary of the chief, and to pay the expense of the bureau is the exercise of a legislative function; but that portion which declares that the said sum shall be paid to Peelle is an attempt to exercise judicial powers by declaring who is the legal chief of the bureau of statistics, and entitled to the salary, and such provision is absolutely void. There is a like provision in the law relating to other officers in charge of State institutions.

Section 4 of the act (Elliott's Supp., sec. 2239a) provides that " If the auditor of State shall draw his warrant for any of the sums herein appropriated, or for any part thereof, to any person or persons except those herein named, when the persons to whom the same are payable are designated or named herein, or if the treasurer of State shall pay any of said sums or any part thereof, except to such persons herein named, he shall be guilty of a felony," etc.

What we have said in regard to the provision of the law relating to the naming of Peelle as the person to whom the amount shall be paid, is equally applicable to this. It is, in effect, in the first instance, an attempted adjudication as to

The State, *ex rel.* Worrell, *v.* Carr, Auditor.

who the legal officers are, and then an effort to enforce the judgment by providing a penalty for disobeying it.

The legal officers are entitled to their salaries, and money appropriated for conducting a department of State, or a public institution, should be drawn by the officer legally entitled to receive it, and not by any certain person, regardless of whether he has been legally elected, or is in possession of the office or not ; and it is not within the province of the Legislature to declare in an appropriation bill who are, or who are not, the legally elected officers of any department. They probably may provide against the paying out of the money to any person other than the legally qualified and acting officer, or officers, and subject the officer to a penalty for paying the same to any other than such officer, or officers; but it can not adjudicate as to who are the legal officers, and provide that payment shall be made to them and none other.

The conclusion we have reached is well supported by the most recent and well-reasoned cases, although there is some irreconcilable conflict in the authorities, particularly in the earlier cases.

In *Andrews* v. *City of Portland*, 79 Maine, 484 (10 Am. St. Rep. 280), it was held that a *de jure* officer might recover his full salary from the city notwithstanding another had been in possession of the office, and kept the *de jure* officer out, and the salary had been paid to the person acting as an officer *de facto*, the city having notice that the officer *de jure* claimed he was illegally deprived of the office; that the city was not entitled to credit for what the *de facto* officer earned by his personal services. In that case the court says :

"A *de facto* officer has no legal right to the emoluments of the office, the duties of which he performs under color of an appointment, but without legal title. He can not maintain an action for the salary. His action puts in issue his legal title to the office, and he can not recover by showing merely that he was an officer *de facto*. In *Nichols* v. *MacLean*, 101 N. Y. 526, 54 Am. Rep. 730, the court says :

'It is abundantly settled by authority that an officer *de facto* can, as a general rule, assert no right of property, and that his acts are void, as to himself, unless he is also an officer *de jure.*' In Cro. Eliz. 699, the doctrine is tersely stated as follows: 'The act of an officer *de facto*, when it is for his own benefit, is void; because he shall not take advantage of his own want of title, which he must be conusant of; but where it is for the benefit of strangers or the public, who are presumed to be ignorant of such defect of title, it is good.'"

In a note by the Hon. A. C. Freeman to this case in the American State Reports, in speaking of the cases holding that a payment to the *de facto* officer is a good defence to an action by the *de jure* officer, he says: "These decisions have been placed partly upon the ground that the officer *de jure* had no property rights in the office, and partly upon the ground that his right to the salary or emoluments of his office was not dependent upon the office, but upon the actual performance of his services as a public official; and further, that while there was an officer *de facto* in actual possession of the office, the disbursing officers were not entitled to consider the question of who ought to be in such possession, nor to question the title in any other way than by a proceeding in *quo warranto.* It is believed that none of these grounds are well taken, and most courts which yet maintain the general rule have substantially admitted in subsequent cases that the grounds for it did not in fact exist. In the first place, it is now well settled that an officer *de facto* is not entitled to the salary of the office, and that although he may faithfully discharge its duties, he can not maintain any action against the city or county for the compensation to which he would be entitled if he were an officer *de jure.* * * In the next place, if he has in fact received the emoluments of the office, he has no right whatever to retain them, and he may be compelled to account therefor to the officer *de jure*, in any appropriate form of action. * * If

a judgment of ouster has been entered against an officer *de facto*, and salary is thereafter paid to him, the officer *de jure* may maintain an action therefor against the city or county, notwithstanding such payment. * * If no part of the salary has been paid during the incumbency of an officer *de facto*, the officer *de jure*, although he performed none of the duties of the office, may maintain an action against the city and county for the salary and emoluments thereof." Mr. Freeman concludes by saying: "Hence the principal case, and cases in California and Tennessee, maintain the doctrine against the weight of authority, but in harmony, we think, with judicial principles, that the payment of the salary to an officer *de facto* in no way impairs the right of the officer *de jure* to recover such salary from the city, county, or other public body charged with the duty of making its payment."

Numerous authorities are cited in support of the doctrine as stated by Mr. Freeman, and we think it lays down the proper rule. See, also, *People, ex rel.*, v. *Smyth*, 28 Cal. 21; *Carroll* v. *Siebenthaler*, 37 Cal. 193; *People, ex rel.*, v. *Oulton*, 28 Cal. 44; *Mayor, etc.*, v. *Woodward*, 12 Heisk. 499. *Matthews* v. *Board, etc.*, 53 Miss. 715; *McCue* v. *County, etc.*, 56 Iowa, 698; *Glascock* v. *Lyons*, 20 Ind. 1; *Douglass* v. *State, ex rel.*, 31 Ind. 429.

Judge COOLEY, in a very able dissenting opinion in the case of *Board, etc.*, v. *Benoit*, 20 Mich. 176, holds that the payment of salary to a *de facto* officer is not a defence to an action by the *de jure* officer, and this is in harmony with all general principles of the law. The *de jure* officer is entitled to the possession and emoluments of the office, and he is unlawfully kept out of it by an intruder.

It is inconsistent with all principles of justice and equity that such intruder and unlawful occupant shall have the emoluments for the length of time he can continue in possession, or that the person from whom the salary is due, when he has knowledge of the facts, can set up as a defence

the fact that a *de facto* officer is in possession of the office and depriving the *de jure* officer of the possession of the office, though, as we have heretofore stated, it is unnecessary to go to this extent in this case, as Worrell, in addition to being a *de jure* officer, was occupying apartments set apart to him by the State, and was discharging the duties of the office as well and as fully as he could in any other place, so that he was both a *de jure* and *de facto* officer. As regards this case, there was an appropriation made to pay the salary of the chief of the bureau of statistics; that money is in the treasury. The only method by which Worrell, who is such *de jure* officer, can recover his salary is by a proceeding in mandate compelling the auditor of State to draw a warrant on the treasurer for the amount.

The auditor refused to draw his warrant and Worrell instituted this suit. The facts found show the money in the treasury; that Worrell is the *de jure* officer; that immediately upon his qualification he was assigned quarters by the auditor of State; that he has discharged the duties of the office. The only possible or pretended defence urged is, that Peelle, who had been acting as a *de facto* chief prior to Worrell's appointment, continued to occupy the apartments which he had theretofore occupied, and to gather statistics and do as he had before done, not having any title to the office, and that the appellee had, with full knowledge of all the facts, paid to Peelle $750 of salary. These facts constitute no defence to Worrell's action for mandamus to compel the payment of his salary. Worrell was entitled to his mandate, and the circuit court erred in its conclusions of law.

The judgment is reversed, with instructions to the court below to restate its conclusions of law, stating that Worrell is entitled to a mandate prayed for to the full amount of salary due him, $2,550, and to render judgment accordingly.

Filed June 18, 1891.

## SEPARATE OPINION.

ELLIOTT, J.—I concur in the conclusion reached in the opinion of the court solely upon the ground that the controversy as to the particular office in dispute is settled by the prevailing opinions delivered in the cases between the claimants to the office on former appeals. Accepting those decisions as the law of the particular controversy, as the court is bound to do, it must follow that Worrell is the rightful officer, and that, as the rightful officer, he is entitled to the compensation attached to the office. The case, in the form it has assumed, is unique, and can not, as I suppose, be deemed a precedent justifying the inference that a State disbursing, or distributing, officer must, at his peril, decide a controversy between rival claimants to a public office. This I say because the doctrine of the prevailing opinions on former appeals is that Peelle did not have, and could not have, any title to the office; and upon these decisions the auditor of State could have acted without incurring any risk, inasmuch as the entire controversy as to the right to the office concerned matters of law and not of fact. In saying this I do not mean to be understood as receding from the opinions heretofore expressed upon the principal question, for I here simply yield to the doctrine declared by the court in its former decisions.

Filed June 18, 1891.