THE STATE ex rel. JESSE A. TOLERTON, State Game and Fish Commissioner, v. JOHN P. GORDON, State Auditor.

In Banc, July 3, 1911.

1. **APPROPRIATION BY LEGISLATURE: Upon Condition.** The General Appropriations Act of 1911, by section 62, appropriated $90,000 out of the "Game Protection Fund," to pay the salaries of the Game and Fish Commissioner and his deputies and the contingent and other expenses of his office, to which was added the proviso: "Provided, that none of the money appropriated in this section shall be available or paid so long as the present State Game and Fish Commissioner remains in this office or is in anywise connected with the office of State Game and Fish Commissioner, except the salaries and accounts due at the time of the approval of this act." *Held*, that the proviso is void, as an unwarranted attempt by the Legislature to control and restrict the appointive power of the Governor, as class legislation, and as a legislative attempt to adjudge the commissioner disqualified to hold the office; but the rest of the act is valid. [VALLIANT, C. J., and WOODSON, J., dissenting.]

2. ————: **Salaries and Expenses: Payable Out of Special Fund: Continuing Appropriation.** An act creating a game protection fund from licenses, penalties and forfeitures, and requiring all salaries of the Game Commissioner and his deputies and all expenses of the department to be paid out of said fund, does not constitute a continuing appropriation, and the moneys in said fund or continually added thereto are not available to pay

the said salaries and expenses unless appropriated biennially as required by section 43 of article 4 and section 19 of article 10 of the Constitution.

3. ————: **Upon Condition: Title.** The title to a general appropriation bill, reading, "An Act to appropriate money for the support of the state government, the contingent and incidental expenses of the state departments, the public printing, and for the payment of certain other demands against the state, for which no appropriation has heretofore been made, for the years 1911 and 1912," etc., is broad enough to comprehend a proviso in the section appropriating $90,000 to the game department, providing that no part of said fund shall be available so long as the present Game Commissioner remains in office or is connected with said department. While the proviso may have had an object ulterior to the subject of the appropriation of money, it is clearly related to that subject and has a sufficiently natural connection therewith as not to be misleading.

4. ————: **Game Commissioner: Title to Office: Mandamus.** Where the return to a writ of mandamus directed to the State Auditor commanding him to show cause why he should not audit the accounts of the Game and Fish Commissioner and issue warrants in payment thereof, admits that the said Commissioner has been appointed and commissioned by the Governor and has been acting as said officer and discharging the duties of said office, and it does not appear that any other person is asserting title to said office adversely to said Commissioner, the title of said Commissioner (the relator) to said office cannot be challenged, and the court will not determine a proposition asserted in respondent's brief that "relator is not now and never has been legally appointed and commissioned as Game and Fish Commissioner."

5. ————: ————: ————: **Resolutions Adopted by Legislature: Judicial Notice.** The General Assembly is not required to furnish a reason for its action, and courts take judicial notice of all resolutions and of all reports of committees adopted by either house. Where the General Assembly appointed a joint committee to investigate the expenditures of the office of the Game Commissioner and his conduct of his office, and adopted a majority report, so much of respondent's return as sets up that report as an explanation of a proviso to a section appropriating money to pay the salaries of said commissioner and his deputies and the expenditures of his office, declaring that no part of the appropriation shall be available so long as he remains in office, will be stricken out, as having no place in the return. The court will take judicial notice of the majority report that was adopted, and the minority report that was not adopted.

6. ——: ——: **Salaries of Officers: Special Legislation.** A statute may be public or general in one part, and private and special in another. The Legislature has the right to refuse to make an appropriation for the payment of the salary of any public officer, and to abolish any office not created by the Constitution. But it has no right to make an appropriation for the payment of the salary and expenses of the Game and Fish Commissioner and then add a proviso declaring that no part of the appropriation shall be available so long as the present incumbent of the office remains in the office or is connected therewith. The appropriation is general and valid; the proviso is private and special and class legislation, and therefore invalid. The proviso singles out one citizen and denies to him a right and privilege accorded to all others.

7. ——: ——: **Misconduct in Office: Judicial Function.** A proviso attached to an appropriation bill, declaring that the money thereby appropriated shall not be available so long as the present incumbent of the office retains it, is an indirect way of removing him from office, and an indirect way of adjudging him unfit and disqualified from holding the office; and where it is apparent, from resolutions adopted by the General Assembly, that it had adjudged him guilty of such mismanagement and misuse of the moneys previously appropriated for the conduct of his office as required his removal, and that the adoption of the resolution was the cause of attaching the proviso to the appropriation, the proviso will be held to be invalid as an attempt by the Legislature to exercise a power delegated by the Constitution to the judicial department of the government.

8. ——: ——: ——: **Transgression on Executive Function.** The Legislature does not have the power to say who shall not be compensated out of an appropriation for the payment of official services rendered, nor to say indirectly who shall be appointed to or removed from the office created by law. A proviso to an appropriation act appropriating money for the payment of salaries and expenses of a certain office, declaring that the money thus appropriated shall not be available so long as the present incumbent remains in office, is an encroachment by the Legislature upon the constitutional power of the Governor, upon whom the law creating the office conferred the power of appointment, and whom the Constitution requires to "take care that the laws are faithfully executed." For the General Assembly to undertake to exclude a certain person from the office by the indirect method of denying to him any salary, is an unwarranted attempt to restrict and limit the Governor's power of appointment.

*Held*, by GRAVES, J., concurring, that this case is not on principle distinguishable from the case of State ex inf. v. Washburn, 167 Mo. 680; that if the act held in judgment there

unduly transgressed upon and restricted the Governor's power of appointment, this more so; that if the proviso, which in effect denies to the Governor the power to retain in office or reappoint the present incumbent, is effective to exclude him, the Legislature has power to attach a proviso to every appropriation for any appointive office providing that no person shall be appointed to said office who is not agreeable to the Legislature or a majority of its members.

*Held*, also, that the practical effect of the proviso is to remove an officer, without a judicial trial, by the indirect method of cutting off his salary; and that such a course, if legal, would not only be a hurtful precedent, opening the door for partisanship, through the General Assembly, to control and dictate to the other departments of the State government, but would destroy that freedom of action in the other departments which the Constitution contemplated.

9. ————: **Valid in Part and Void in Part: Tests: Game Protection.** A statute may be void in part and the remainder be sustained as a valid and subsisting law. If the invalid part is so connected with the residue of the act as to furnish the inducement or consideration for the enactment of the residue, and to warrant the belief that the Legislature intended them as a whole and would not have passed the part remaining had it known the other part would be held invalid, then the entire act must fail; otherwise, the invalid part will be declared void, and the balance upheld. So that where the Legislature made an appropriation out of the Game Protection Fund of $90,000 to pay the salaries and expenses of the Game Department, which had been created by a previous legislature, and to which two years previously had been appropriated $200,000, of which $43,880.85 had been expended for game birds and eggs, for renting and equipping a game farm and for shipping and distributing the birds and eggs among the people of the State; and where the fund had been paid by the hunters through licenses and otherwise upon the faith of the prior law that the fees so paid would be set aside and constitute a fund for the payment of the expenses of the department, and it can be used for no other purpose; and where disastrous consequences to the birds and eggs and other property on hand must necessarily ensue, and the fish and game of the State be destroyed, if no appropriations were made to the department; and where the Legislature must have known that if the present commissioner had mismanaged and misused moneys formerly appropriated, as a majority report of an investigating committee adopted by it declared, he could quickly and certainly be removed from office, the conclusion is irresistible that a proviso attached to the appropriation, declar-

236 Sup.—10

ing in effect that no part of the money should be available so long as the present incumbent retains his office, was not the inducement for the appropriation, and was not a *sine qua non*, and though the proviso be void, the rest of the appropriation is valid. [VALLIANT, C. J., and WOODSON, J., dissenting.]

### Per VALLIANT, C. J., dissenting.

1. **DEPARTMENTS OF GOVERNMENT: Transgression on Other Departments by Judiciary.** The judicial department, when passing judgment upon the act of another department which it is charged is a usurpation upon the power of either of the others should itself be exceedingly careful not to usurp legislative or executive power; and that is exactly what the action of the court as expressed by the majority opinion in this case does.

2. **LEGISLATIVE APPROPRIATION OF MONEY: Conditions.** Since the appropriation of money to pay the salaries and expenses of the Game and Fish Commissioner was necessary and the Constitution leaves it to the General Assembly to make it, the General Assembly can make it for as much or as little as it sees fit, and may impose what conditions it sees fit to impose, and may specify the purposes for which it may or may not be used, and no other department of the State government can interfere with the exercise of that power, whether it be exercised wisely or unwisely.

3. ———: **Power to Appropriate Implies Power to Attach Condition.** There is no difference in effect between refusing to make an appropriation because of distrust of the officer in charge of an office, and making an appropriation on condition that it shall not be used while that official is in office. The one is no more an interference with the Governor's power to appoint than is the other; no more liable to force the resignation of the officer than the other; and if the one is unwise, unjust and impolitic, the other is equally so. No department of the State government can lawfully authorize the withdrawal of money from the State Treasury except the General Assembly, and then only on the terms and conditions prescribed by the General Assembly, let the consequences be what they may. When the court says the proviso attached to the appropriation to the Game Department can be set at naught, and the appropriation be used in defiance of the express inhibition of the statute making the appropriation, it lays a limitation on the power of the General Assembly that the Constitution has not laid. The proviso is a condition on which the money appropriated can be used, and if those persons interested in the enforcement of the game laws do not wish to observe the conditions they are in the same condition in which they would be if no appropriation at all had been made.

4. ————: Condition: Interference With Governor's Power of Appointment. The condition attached by the proviso to the appropriation that no part of it should be available so long as the present incumbent remains in office does not interfere with the Governor's power of appointment. The Governor has already freely exercised his power by appointing the incumbent. The case of State ex inf. v. Washburn, 167 Mo. 680, wherein it was held that an act which undertook to restrict the Governor's power of appointment to one of three men named by a party committee was void, has no point in common with this case.

5. ————: ————: ————: Striking Out Item. The Governor does not have the power to approve the item of an appropriation bill, and disapprove the condition on which the money is appropriated.

6. ————: ————: Invalid in Part Invalid in Toto. The intention of the Legislature in appropriating $90,000 to the Game Department, and therein providing by a proviso attached thereto, that no part of the amount should be available so long as the present Game and Fish Commissioner remains in office, was expressed in the proviso, and is inseparable from the rest of the act, and no.part of the money would have been appropriated without that proviso, and, therefore, if the proviso is void the whole section is void. The court cannot apply money appropriated by the Legislature to a purpose to which it did not intend it to be applied.

### Per WOODSON, J., dissenting.

1. APPROPRIATION TO CERTAIN PURPOSE: Diverted to Another. It being conceded that if the Legislature had made no appropriation for the use of the Game Department, the courts would be powerless to compel the State Auditor to audit the account and issue a warrant to the Game Commissioner in payment of his salary, for to do that would have the effect of taking money from the State Treasury without an appropriation, in violation of the express inhibitions of the Constitution, then the court cannot compel the State Auditor to issue such a warrant, for a stronger reason, namely, that there is not only no appropriation made for the use of the present incumbent of the office, but there is an express provision in the act withholding all sums from his use.

2. ————: Special Legislation. The proviso to said appropriation is not void as special legislation, for all appropriations under the provisions of the Constitution are special.

## Mandamus.

PEREMPTORY WRIT ISSUED.

*Lon O. Hocker* and *R. T. Railey* for relator.

(1) Art. 2 of Chap. 49, R. S. 1909, contains the law of this State in reference to the preservation of fish and game, specifies the salary of the game warden, and provides that it shall be paid out of the game protection fund by warrant drawn by the State Auditor on said fund in the hands of the State Treasurer. When the above act became effective, Aug. 16, 1909, it required no further appropriations by the Legislature, or any other body, to pay the salary and expenses incurred by the State Game and Fish Commissioner. Sec. 43, Art. 4, Constitution of Missouri; sec. 19, art. 10 of Constitution; Ex parte Lucas, 160 Mo. 218; State ex rel. v. Mason, 153 Mo. 59; Reynolds v. Taylor, 43 Ala. 420; Nichols v. Comptroller, 4 Stew. & P. 157 (Ala.); State v. Weston, 4 Neb. 216; Gilbert v. Moody, 25 Pac. 1092; San Francisco v. Dunn, 69 Cal. 73; State ex rel. v. Hickman, 9 Mont. 370; State ex rel. v. Hickman, 10 Mont. 497; State ex rel. v. Grimes, 7 Wash. 193; State ex rel. v. Eggers, 91 Pac. 819; State ex rel. v. Goodykoontz, 22 Colo. 507; Goodykoontz v. Acker, 19 Colo. 360; Henderson v. Monument, 129 Ind. 92; Campbell v. Monument, 115 Ind. 591; State ex rel. v. Maddox, 11 Mont. 555; State v. Bordelon, 6 La. Ann. 68; State ex rel. v. King, 108 Tenn. 271; Kendall v. Rayland, 13 Utah 226; Donnellan v. Nicholls, 1 Wyo. 61; State ex rel. v. Burdick, 4 Wyo. 272; State ex rel. v. Westerfield, 23 Nev. 468; Bryan v. Menefee, 95 Pac. 471; In re Groff, 21 Neb. 647; Leadville v. Matthews, 10 Colo. 125; Bishop v. Lambert, 114 Mich. 110; Proll v. Dunn, 80 Cal. 220; People ex rel. v. Brooks, 16 Cal. 11; Humbert v. Dunn, 84 Cal. 57; Carr v. State, 127 Ind. 204; Ristine v. State, 20 Ind. 204. (2) The power of appointment and removal of State Game and Fish Commissioner is vested in the Governor alone. The proviso at the conclusion

of Sec. 62, House Bill 1200, is therefore void, as the Legislature had no legal right to enact the same. Art. 3, Constitution of Missouri; State ex inf. v. Washburn, 167 Mo. 691; State ex rel. v. St. Louis, 216 Mo. 96; State ex rel. v. Judge, 47 La. 59; State ex rel. v. Dougerty, 13 Am. Rep. 131; State ex rel. v. Peelle, 8 L. R. A. 231; State ex rel. v. Carr, 13 L. R. A. 181; McCornick v. Pratt, 17 L. R. A. 248; Clayton v. Territory, 132 U. S. 642; People ex rel. v. Howland, 155 N. Y. 270; Reid v. Smoulter, 128 Pa. St. 324. (3) That part of Sec. 62, providing that no part of the ninety thousand dollars appropriated should be used while relator was in office, is illegal and void, but the remainder of the act can be upheld. If it was the duty of the Legislature to make an appropriation then it did so in setting apart the ninety thousand dollars to be used for the purpose of enforcing the game law of this State. The Legislature had no right to limit the use of this fund any more than it had the right to remove relator from office. The action of the General Assembly in respect to said proviso can, therefore, be treated as a nullity, and the balance of the act sustained, if it be held that an appropriation was necessary. State ex rel. v. Taylor, 224 Mo. 473; Gracy v. St. Louis, 213 Mo. 397; State ex rel. v. Corcoran, 206 Mo. 1; State ex rel. v. Comrs., 184 Mo. 134; State ex inf. v. Washburn, 167 Mo. 681; State ex rel. v. Walbridge, 153 Mo. 203; State ex rel. v. Field, 119 Mo. 612; Clayton v. Territory, 132 U. S. 642; State v. Carr, 28 N. E. 88; State ex rel. v. Carr, 13 L. R. A. 181; State ex rel. v. Westerfield, 49 Pac. 121. (4) The provision attached to Sec. 62, House Bill 1200, is not within the title to the appropriation bill, and is in direct conflict with Sec. 28, Art. 4, Constitution. State ex rel. v. County, 41 Mo. 40; State ex rel. v. Herrmann, 75 Mo. 341; State v. Persinger, 76 Mo. 346; State ex rel. v. Baker, 129 Mo. 486; Witzmann v. Railway, 131 Mo. 618; Henderson v. Koenig, 168 Mo. 370; State v. Coffee Co., 171 Mo. 634; State v. Fulks, 207 Mo. 206; State ex rel.

v. Turner, 210 Mo. 83; St. Louis v. Wortman, 213 Mo. 131.

*Elliott W. Major,* Attorney-General, and *Charles G. Revelle,* Assistant Attorney-General, for respondent.

(1) The conditional appropriation made by the Legislature to the Game and Fish Department is presumed to be valid. The burden rests upon relator to prove it invalid beyond a doubt. Before the court can declare it invalid it must contravene some constitutional provision. (a) Under the decisions of this honorable court, every presumption is indulged in favor of the validity of the act of the Legislature in making the conditional appropriation to the game department, and that presumption continues until its invalidity is made to appear beyond all doubt. State v. Douglass, 50 Mo. 597; State v. Thompson, 144 Mo. 314; State ex rel. v. Aloe, 152 Mo. 477; In re Hill, 200 Mo. 646; State v. Hope, 100 Mo. 347; State v. County, 102 Mo. 531; Murnane v. St. Louis, 123 Mo. 479; State v. Warner, 197 Mo. 650; State v. Layton, 160 Mo. 488. (b) It devolves upon the relator to establish the invalidity of the condition in the appropriation made by the General Assembly beyond a doubt. We undertake to say that the relator has in no way presented any reason or argument against the validity of the appropriation as made. State v. Ranson, 73 Mo. 78; State v. Laughlin, 75 Mo. 147; State v. Addington, 77 Mo. 110; Phillips v. Railroad, 86 Mo. 540. (c) When substantial doubt exists as to the duty whose performance it is sought to coerce, or as to the right or power of the officer to perform the duty, relief by mandamus will be withheld. State ex rel. v. Buhler, 90 Mo. 570; State ex rel. v. Bridge Co., 206 Mo. 133; State ex rel. v. Wilder, 211 Mo. 305; State ex rel. v. McIntosh, 205 Mo. 589. (d) It is immaterial what views this honorable court may en-

tertain about the wisdom of the condition contained in the appropriation, or whether it is unjust or unreasonable. Such matters are not for the courts. It is for the Legislature alone to determine these matters. Although, in the opinion of the court, a legislative act is unjust, oppressive and unreasonable, yet it cannot declare the same invalid unless it contravenes some provision of the Constitution. Court v. Griswold, 58 Mo. 175; Railroad v. Little, 45 Ga. 388; State ex rel. v. McClelland, 138 Ind. 395; Horton v. Comrs., 43 Ala. 605; Comm. v. Hartman, 17 Pa. St. 119; People v. Railroad, 34 Barb. 138. (2) Relator is not now and never has been legally appointed and commissioned as Game and Fish Commissioner. Relator states in his petition that the law under which he was appointed and commissioned took effect August 16, 1909. Respondent admits, and the court will take judicial notice, that said law became effective upon that day. Relator further alleges in his petition, and it is admitted by respondent, that relator was appointed and commissioned Game and Fish Commissioner by the Governor on July 27, 1909. Upon that day his commission was issued, signed by the Governor, attested by the Secretary of State and bore the great seal of the State of Missouri. It therefore appears that relator was appointed to an office twenty days prior to the time when the law became effective, and twenty days before there was any such office, and therefore his appointment and commission were invalid. Rhodes v. Hampton, 101 N. C. 629; State ex rel. v. Meares, 116 N. C. 582; State ex rel. v. Court, 91 Pac. 4; State ex rel. v. Boecken, 56 Mo. 1. (3) (a) The Legislature had the right to make the appropriation to the game department and in so doing could make it absolute or conditional. Railroad v. Kirkwood, 159 Mo. 239; State ex rel. v. Clifford, 228 Mo. 208; Blanding v. Burr, 13 Cal. 343; State v. Holder, 76 Miss. 181. (b) If the condition in Sec. 62, House Bill 1200, is in-

valid for any reason, then the whole section is invalid, and the appropriation to the game department must fail. Railroad v. Kirkwood, 159 Mo. 253; State ex rel. v. Clifford, 228 Mo. 194; State v. Moore, 69 N. W. 377; Pickle v. Finley, 44 S. W. 481; Lukens v. Nye, 156 Cal. 503; State v. Holder, 76 Miss. 181; Porter v. Hughes, 4 Ariz. 1; Sprague v. Thompson, 118 U. S. 90; Warren v. Mayor, 2 Gray (Mass.) 84; Slauson v. Racine, 13 Wis. 398; State v. Dousman, 28 Wis. 541; Hinze v. People, 92 Ill. 406; Ex parte Frazer, 54 Cal. 94; Eckhart v. State, 5 W. Va. 515; Cooley's Con. Lim., 179; Reed v. Railroad, 33 Cal. 212; Campau v. Detroit, 14 Mich. 276; State v. Com., 5 Ohio 497; Tel. Co. v. State, 62 Tex. 630; Copeland v. St. Joseph, 126 Mo. 417. (c) The proviso and the appropriation in Sec. 62, House Bill 1200, are so inseparably connected that one cannot stand without the other. Copeland v. St. Joseph, 126 Mo. 428. (d) The court will look to the legislative history of the bill in order to determine whether or not the proviso or condition in the appropriation constituted the inducement or consideration for the Legislature to make the appropriation. Church v. U. S., 143 U. S. 463; Ex parte Helton, 117 Mo. App. 609. (4) (a) The Legislature in adopting the proviso or condition contained in Sec. 62 aforesaid did not interfere with nor in any way usurp any of the powers properly belonging to the Executive Department nor infringe upon the provisions of Art. 3 of the Constitution. Sec. 19, art. 10, Constitution; sec. 43, art. 4, Constitution; State ex inf. v. Shepherd, 177 Mo. 269; State v. Moore, 69 N. W. 377; Pickle v. Finley, 44 S. W. 481. (b) Relator's claim to compensation being subject to legislative control, and the Legislature having refused to appropriate money in payment thereof for this biennial period, two courses are open to him. He can resign or continue in office. If he continues in office, he does so voluntarily, and must accept the conditions named by the

Legislature and take chances on future legislatures appropriating or refusing to appropriate money in payment of his compensation. The Legislature can abolish legislative offices or take away entirely the emoluments of such office. The Legislature could have abolished the office of Game and Fish Commissioner or it could have taken away the salary and provided that he should act without compensation. The Legislature created the office and the Legislature has the right to control the purse in reference thereto for the biennial period for which it can make appropriations. The Legislature can bind no longer than for the biennial period, because one session of the Legislature cannot bind another. Wilcox v. Rodman, 46 Mo. 324; Barker v. Pittsburg, 4 Pa. St. 51; Ex parte Lambert, 52 Ala. 82. (c) The appointing power is not an inherent executive prerogative, and the power of the Legislature is subject to no restrictions except those imposed by the Constitution. Hovey v. State ex rel., 119 Ind. 399. (5) No moneys can be paid out of the State treasury or any of the funds under its management except in pursuance of an appropriation by law. Where the funds of a department created by legislative enactment reach the treasury, there is no such thing as the law itself being an appropriation under our Constitution. Sec. 43, art. 4, Constitution; Sec. 19, art. 10, Constitution; State v. Holladay, 65 Mo. 77; State ex rel. v. Holladay, 66 Mo. 389; Fusz v. Spaunhorst, 67 Mo. 268; State ex rel. v. Henderson, 160 Mo. 213.

KENNISH, J.—This is an original proceeding in this court by mandamus. The relator, Jesse A. Tolerton, is the State Game and Fish Commissioner of this State, and the respondent, John P. Gordon, is the State Auditor. The object and purpose of the suit is to have this court issue its peremptory writ of mandamus requiring and compelling the respondent as such auditor

to audit and allow two accounts theretofore presented to respondent by relator, which respondent refused to audit or issue warrants for as requested.

The issuance of the alternative writ was waived and the respondent filed his return to the petition. The relator filed a motion to strike out a part of the return and for judgment on the pleadings. Upon the issues of law thus raised the cause was argued and submitted for decision.

It appears from the facts alleged and which stand admitted by the pleadings that on the first day of May, 1911, relator, as Game and Fish Commissioner, presented to respondent, as Auditor, for audit and allowance, two accounts, one for his salary for the month of April, 1911, and the other an account for feed purchased for the game birds belonging to the State, kept and in charge of the relator on the State Game Farm. The account for feed was in the sum of forty-seven dollars and ninety-one cents and was contracted, as shown by its date, on the 20th day of April, 1911. Respondent audited and allowed the account for relator's salary to the 19th of April, 1911, but refused to audit or issue a warrant for any salary after that date or for the account for feed. When the accounts were presented to respondent he indorsed on the back of the salary account the following:

"Approved and audited in the sum of $131.94, being salary of Game and Fish Commissioner from April 1st, 1911, to April 19th, 1911, inclusive, being day Governor signed and approved House Bill No. 1200. This 1st day of May, 1911.

"JOHN P. GORDON, State Auditor."

And on the account for feed:

"Refused to audit for want of an available appropriation to pay same. This 1st day of May, 1911.

"JOHN P. GORDON, State Auditor."

Respondent made no objection to the correctness of the accounts as authorized by the provisions of the game and fish law under which relator was acting, but based his refusal to audit them and issue warrants therefor upon the provisions of section 62 of the act known as House Bill No. 1200. Said act is the general appropriation act passed by the General Assembly for the support and maintenance of the institutions of this State for the years 1911 and 1912, and section 62 thereof is the only part of said act making provision for the support of the fish and game department for the years named. [Laws 1911, Sec. 62, p. 18.]  This act was approved by the Governor April 19, 1911. Its title and said section 62 are as follows:

"An Act to appropriate money for the support of the state government, the payment of the contingent and the incidental expenses of the state departments, the public printing, and for the payment of certain other demands against the State, for which no appropriation has heretofore been made, for the years 1911 and 1912, and appropriating money to the various counties to be used in the construction and improvement of the public roads, with an emergency clause.

"Sec. 62. *Fish and game commissioner.*  There is hereby appropriated out of any money in the State treasury belonging to the 'game protection fund,' the sum of ninety thousand dollars ($90,000), as follows: For the salary of the game and fish commissioner, five thousand dollars ($5000); for the salaries and traveling expenses of deputies, sheriffs and constables, appointed deputy game wardens as provided in this act, thirty-six thousand five hundred and seventy-five dollars ($36,575):  Provided, that not more than one-half of this amount shall be used for any one year; for contingent office expense, such as stationery, telegraphing, telephoning, office supplies and the traveling expenses of the game and fish commissioner, thirty-

eight hundred dollars ($3800); for printing, one thousand dollars ($1000); for pay of stenographer, eighteen hundred dollars ($1,800); for clerk in the office eighteen hundred and twenty-five dollars ($1825); for the purchase and propagation of game on the game farm, not exceeding five employees, the sum of forty thousand dollars ($40,000); provided that said game and fish warden shall not employ more than sixteen deputies at any one time, said sixteen deputies to be selected one from each congressional district, and the sheriff, or some constable in each county, shall be designated by the warden as deputy for such county and when detailed to such duties shall receive same compensation as other deputies; provided, that none of the money herein appropriated in this section shall be available or paid so long as the present state game and fish commissioner remains in this office or is in any wise connected with the office of state game and fish commissioner, except the salaries and accounts due at the time of the approval of this act.''

The legality of the action of respondent in refusing to audit and issue warrants for the accounts as requested by relator, for the reason that the funds provided for the support of the game department were not available for the payment of the same, is the decisive question in this case. If the last proviso to said section 62, hereinafter referred to as the ''proviso,'' is a valid enactment, or, if invalid the entire section is also invalid, the writ should be denied. On the other hand, if the proviso be held invalid and that part of the section making the appropriation be held valid and enforcible notwithstanding the invalidity of the proviso, then relator was entitled to the warrants as requested and the peremptory writ of mandamus should issue.

Other points are discussed in the briefs of counsel, as they were at the oral argument, which we shall refer

to but briefly before taking up what we deem, as above stated, the determinative questions in the case.

I. It is contended by relator that: "Article II of Chapter 49, Revised Statutes 1909, contains the law of this State in reference to the preservation of fish and game, specifies the salary of the game warden, and provides that it shall be paid out of the game protection fund by warrant drawn by the State Auditor on said fund in the hands of the State Treasurer. When the above act became effective, August 16, 1909, it required no further appropriation by the Legislature, or any other body, to pay the salary and expenses incurred by the State Game and Fish Commissioner."

In support of the foregoing proposition relator maintains that the provisions of the game law referred to constitute a continuing appropriation, under which respondent was authorized and it was his duty to issue warrants for such salary and expenses as were properly chargeable to the game protection fund, without any further appropriation for that purpose by the General Assembly as made in section 62 of said House Bill No. 1200.

We cannot agree to that contention. It is provided by section 43, article 4 of the Constitution of this State that: "All revenue collected and moneys received by the State from any source whatsoever shall go into the treasury, and the General Assembly shall have no power to divert the same, or to permit any money to be drawn from the treasury, except in pursuance of regular appropriations made by law." And by section 19, article 10, that: "No moneys shall ever be paid out of the treasury of this State, or of any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made, or a warrant shall have issued therefor, within two years after the passage of such appropriation act; and every such law, making a new appropriation, or continuing or reviving an appropriation, shall dis-

tinctly specify the sum appropriated, and the object
to which it is to be applied, and it shall not be sufficient
to refer to any other law to fix such sum or object."

The language of the foregoing provisions of the
Constitution is clear and explicit and forbids the pay-
ment of money from the State treasury "received from
any source whatsoever" or "of any funds under its
management" except in pursuance of regular appro-
priations made by law. Because of this constitutional
inhibition we have no difficulty in deciding that in the
absence of an appropriation made by the General As-
sembly for that purpose no funds could be lawfully
paid out of the State treasury for the support and
maintenance of the game department, nor would re-
lator be entitled to the audit and allowance of his ac-
counts for salary and expenses. [See Secs. 11828 and
11836, R. S. 1909; State v. Holladay, 65 Mo. 77; State
ex rel. v. Holladay, 66 Mo. l. c. 389; Fusz v. Spaun-
horst, 67 Mo. l. c. 268; State ex rel. v. Henderson, 160
Mo. l. c. 213, 214.] In addition to the foregoing cita-
tions it should be added that the General Assembly
which enacted the game and fish law appropriated out
of the State treasury the sum of two hundred thousand
dollars, or so much thereof as should be necessary,
from the game protection fund, to meet the expenses
of the department for the biennial period therein
named, and by so doing gave a legislative construction
to the law and the Constitution as to the necessity of a
biennial appropriation. [Sec. 72, Laws 1909, p. 535.]

II. Neither can we concur in relator's contention
that the proviso is not within the title of the bill as
required by section 28, article 4, of the Constitution.
While the proviso may have had and doubtless did
have an object ulterior to the subject of the appropri-
ation of money, it is clearly related to that subject and
has a sufficiently natural connection therewith as not
to be misleading and as not to conflict with the section

of the Constitution concerning the title of a legislative bill. [Ewing v. Hoblitzelle, 85 Mo. 64; State v. Bixman, 162 Mo. 1; State ex rel. v. Vandiver, 222 Mo. 206.]

III.   Respondent asserts the proposition in his brief that: "Relator is not now and never has been legally appointed and commissioned as Game and Fish Commissioner," and insists that by reason of that fact alone, relator cannot maintain this action and respondent was warranted in refusing to issue the warrants and audit relator's accounts.

It is admitted in respondent's return that relator was appointed and commissioned by the Governor as Game and Fish Commissioner and that since the 16th day of August, 1909, he has been acting as such officer and discharging the duties of the office. It does not appear that any other person is asserting adverse title to such office.   Under these admitted facts it is settled law that relator's title to the office cannot be challenged in a mandamus proceeding for his salary. In the case of State ex rel. v. John, 81 Mo. 13, this court, in harmony with the general law on the subject, and as tersely stated in the syllabus, held: "The right to an office cannot be determined in a proceeding by mandamus to compel the payment of salary to a person claiming such office, or in a proceeding to compel the performance of official duty alleged to be obligatory, by reason of the official character of the claimant.   In such cases he who has the better prima facie right must be recognized until, by contesting the election, or by proceedings in quo warranto, the rights of the parties are finally determined."   See also State ex rel. v. Draper, 48 Mo. 213; State ex rel. v. May, 106 Mo. 488; State ex rel. v. Rodman, 43 Mo. 256.

IV.   Respondent pleads affirmatively in his return facts concerning the adoption of a resolution of the Senate on the 26th day of January, 1911, to investi-

gate the condition and administration of the affairs and the expenditures of money by relator in the office of Game and Fish Commissioner, also the appointment of a joint committee for that purpose, and sets forth at length the report of the committee sustaining the charges made against relator. It is further alleged in the return that upon the adoption of the report of the committee, the proviso "was incorporated in said section 62 of said bill by amendment, and that said proviso constituted, was and is the one condition which induced the Forty-sixth General Assembly of the State of Missouri to adopt and enact said section 62 and appropriate said moneys therein stated out of the game protection fund."

Relator's motion to strike out part of respondent's return and for judgment on the pleadings, moves the court to strike out all of paragraphs eighteen to twenty-two, inclusive, being the matter affirmatively pleaded and relating to the appointment and report of the committee concerning the investigation of the affairs of relator's office.

In the determination of the questions presented in this case facts affirmatively pleaded in the return are of no importance. So far as they afford a reason for the action of the Legislature in the enactment of the proviso they are immaterial. The lawmaking body is not required to furnish a reason for its action. It has been said, "The law itself stands for a reason." So far as such affirmative facts may be legitimately referred to, in order to ascertain the legislative intent in the enactment in controversy, this court will take judicial notice of the entire legislative proceedings in the course of the passage of the act, whether pleaded or not. Under this well recognized rule, in order to arrive at the legislative intent in passing the appropriation act under consideration and in adding the proviso thereto, this court will take judicial notice of the majority report of the committee, sustaining the

charges of misconduct in office against relator, though not pleaded in the return, and under the same rule it will take judicial notice of the report of the minority members of the same committee arriving at a directly opposite conclusion.

V.  Relator maintains that the proviso of section 62 of House Bill No. 1200 is illegal and void. Respondent contends that it is valid, but further that if invalid then the entire section falls with it and no legal appropriation exists out of which relator's accounts can be audited or paid. If either of respondent's contentions can be sustained the writ must be denied, otherwise it should be issued.

There is no doubt of the power of the Legislature to refuse to make an appropriation for the payment of the salary and expenses of any public officer holding office under the Constitution or laws of this State. Neither is there any doubt as to its power to abolish any office not provided for by the Constitution. And in either case the incumbent of the office has no legal ground of complaint. But in this case the Legislature has made an appropriation for the payment of the salary and expenses of the Game and Fish Commissioner, and the funds so appropriated are made available to pay such salary and expenses to any citizen of this State who may hold that office, with the sole exception that such payment is denied to relator, now holding that office.

The question is thus presented whether the Legislature may by a proviso to an appropriation act single out one citizen of this State and deny to him a right and privilege accorded to all others, without clashing with constitutional guaranties.

After a careful consideration of the subject, no doubt is entertained that this proviso is invalid and void. It will be observed that the body or purview of

236 Sup.—11

said section, in accordance with the subject of the title of the act, provides for the support and maintenance for two years of the game department of this State, by the appropriation of ninety thousand dollars. In that form it was drafted and introduced by the committee intrusted with the responsible duty of having charge of the appropriation of funds for the support of all of the public institutions of this State, and in that form, without any condition or proviso, it passed the House by an almost unanimous vote. Thus far the bill is what is known as a general law, in that its operation affected the people generally and not one person or persons of a class only. The proviso, which was first added by amendment in the Senate, attempts to suspend the appropriation and render it unavailable so long as relator shall remain in the office of Game and Fish Commissioner or shall be in any manner connected therewith. In singling out relator from the class of persons eligible to hold that office and in making the proviso apply to and exclude him only, by imposing on him a burden not imposed on any other person, the proviso became special legislation in the most pronounced form. If the Legislature may by a proviso render an appropriation unavailable so long as the relator remains in the office referred to, it necessarily follows that it may also make it unavailable so long as any person of the same political party affiliations as the relator remains in or may be connected with that office. It is too plain for argument that such a law or proviso would not be a general law, operating upon the public generally and equally, but that it would be special or class legislation, granting to individuals of one class special privileges denied to those of another class.

In 1 Lewis's Sutherland on Statutory Construction, sec. 199, it is said: "Special laws are those made for individual cases, or for less than a class."

Discussing the subject of public, and private or special laws, Potter's Dwarris at page 53 says: " 'Public acts relate to the public at large, and private acts concern the particular interest, or benefit of certain individuals, or of particular classes of men.' In a general act, there may be a private clause. So, a statute which concerns the public revenue is a *public* statute, but some clauses therein, may, if they relate to private persons only, be *private;* for a statute may be public in one part, and private in another. A general or public act, then, regards the whole community; special or private acts relate only to particular persons, or to private concerns."

In the case of State ex rel. v. Herrmann, 75 Mo. l. c. 353, this court said: "Judge Cooley says: 'A statute would not be constitutional . . . which should select particular individuals for a class or locality and subject them to peculiar rules, or impose upon them special obligations or burdens from which others in the same class or locality are exempt. . . . Every one has a right to demand that he be governed by general rules, and a special statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied in all similar cases would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free government.' [Cooley, Con. Lim., 391.] Section 4 does just this prohibited thing. It selects particular individuals, i. e., notaries whose commissions bear certain dates, from a general class, i. e., all notaries in said jurisdiction, and subjects them to peculiar rules, from which all others in the same class are exempt. Such a law cannot be otherwise than special, and can justly bear no other name or designation."

And in the recent case of State ex rel. v. Taylor, 224 Mo. l. c. 477, a most clear and concise statement of the law upon the subject of special or class legislation

is found. Speaking for the court, WOODSON, J., said: "The constitutionality of said article 4 of chapter 122 is assailed for the alleged reason that it is a local or special law within the meaning of section 53 of article 4 of the Constitution. In view of the rulings of this court bearing upon that question, we are unable to lend our concurrence to that contention. These laws apply to and govern all persons equally who come within their scope. The test, under our decisions, as to whether a statute is local or general is, if it operates upon all persons alike who come within its scope or range, then it is general, and not subject to the denunciation of said section 53; but, if, upon the other hand, it operates only on a portion of such persons, then it is a special law, and is subject to the inhibition of said constitutional provision. The act here applies to all who are embraced within its provisions. [State v. Etchman, 189 Mo. 648; State ex inf. v. Standard Oil Co., 218 Mo. 1; Coffey v. City of Carthage, 200 Mo. 616.]"

Under the foregoing authorities the proviso under consideration falls directly within the definition of special laws and is expressly prohibited by section 53, article 4, of the Constitution of this State.

It may be added that if a proviso such as that under consideration, by which the right to salary for service is denied to one or more persons of a class, can be upheld, then the possibilities of such legislation are at once suggested. In times of high partisan feeling there would be no restraint upon the power of the dominant party to attach to every appropriation for the salaries and expenses of State officers, whether executive or judicial, a proviso making the funds so appropriated unavailable to pay the salaries or expenses of any person of opposite political party allegiance; and those thus discriminated against would be without redress. And in view of what was attempted by the proviso in judgment, such an assumption is not an extreme case.

VI.   The proviso is invalid upon another ground. It is an encroachment upon the judicial department of Government.   Article 3 of the Constitution of this State is as follows: "The powers of government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted."   It is provided by section 4413 of the Revised Statutes of 1909 that:   "Every person who shall be convicted of any of the offenses mentioned in the preceding sections of this article shall be forever disqualified from holding any office of honor, trust or profit under the Constitution and laws of this State, and from voting at any election; and every officer who shall be convicted of any official misdemeanor or misconduct in office, or of any offense which is by this or any other statute punishable by disqualification to hold office, shall, in addition to the other punishment prescribed for such offenses, forfeit his office."

An examination of section 62 under consideration makes it plain that the main purpose of the proviso is the removal of the relator from the office of Game and Fish Commissioner.

By depriving relator of any compensation for the services which the game law demands he should render, his enforced removal from the office would be as effectually brought to pass as if ordered and enforced by a direct mandate of a court.   It is not essential to the capture of a city or fort that it should be stormed or taken by force.   The same result may be reached and with equal certainty by cutting off supplies, by maintaining a successful blockade or siege.   In the Merchant of Venice the leading character is made to

say: "You take my house when you do take the prop that doth sustain my house. You take my life when you do take the means by which I live."

Considering the character of the office of Game and Fish Commissioner and the services required of the incumbent, it is idle to say that cutting off the compensation does not interfere with the right to continue in the office. The body of this section appropriates ninety thousand dollars for the support of the game department. The proviso, if valid, placed it within the power of one man to defeat the purpose of the appropriation and cause the property of the State to perish and be sacrificed should he remain in office. It would be doing an injustice to the Legislature to assume that such a reckless result as the destruction of the State's property was contemplated. The more reasonable and probable construction of the legislative intent in the enactment of the proviso is that by depriving the relator of compensation it would have the effect of removing him from the office and that another would be appointed in his stead and that the funds appropriated would then be used for the purpose stated in the act. In the case of Reid v. Smoulter, 128 Pa. St. 324, the court passed upon the constitutionality of an act which repealed a law providing for the payment of the salary of an officer without making any other provision for the compensation of such officer. Discussing the question thus presented, the court, l. c. 335, said: "The salary first fixed may perhaps be increased or diminished, subject to the restriction of the 13th section of the 3d article of the Constitution, as the Legislature should from time to time see fit to provide, but to repeal the provision for a salary altogether, is to remove the clerk from his office." See, also, People ex rel. Burby v. Howland, 155 N. Y. 270. In the case last cited, discussing the effect of an act of the Legislature cutting off the compensation of an office, the court said: "When the main purpose of a statute, or of part of a

statute, is to evade the Constitution by effecting indirectly that which cannot be done directly, the act is to that extent void, because it violates the spirit of the fundamental law.'' In State ex rel. Worrell v. Carr, 129 Ind. 44, it appears from the statement of facts that there were two claimants for the same office. The Legislature made an appropriation for the payment of the salary of the office, adding a proviso that the sums appropriated should be paid to William A. Peelle, one of the claimants, ''and to no other person or persons.'' The court held that as the other claimant was entitled to the office he was entitled to the salary and that the proviso was an attempted adjudication by the Legislature of a person's title to an office and was therefore void. The court, l. c. 54, said: ''The Constitution provides that no person charged with official duties, under one department of state, shall exercise any of the functions of another. [Article 3, section 1.] The part of the law making an appropriation to pay the salary of the chief, and to pay the expenses of the bureau is the exercise of a legislative function; but that portion which declares that said sum shall be paid to Peelle is an attempt to exercise judicial powers by declaring who is the legal chief of the bureau of statistics, and entitled to the salary, and such provision is absolutely void.''

It is alleged in respondent's return that among the things found and declared in the report of the committee appointed to investigate the affairs of relator's office, which report was adopted, was the following: ''That relator had used and expended the moneys so appropriated out of said 'Game Protection Fund' for improper, unlawful and illegal purposes, and had otherwise been guilty of misconduct in conducting the affairs of the Game and Fish Department.'' And it is contended that the proviso ''contained in said section 62 of said House Bill No. 1200, was incorporated in said section 62 of said bill by amendment, and that

said provision constituted, was and is the one condition which induced the Forty-sixth General Assembly of the State of Missouri to adopt and enact said section 62 and appropriate said moneys therein stated out of the 'Game Protection Fund.' "

On the other hand it is stated in the minority report of the same committee, of which this court will also take judicial notice, that: "The satisfactory conduct of this investigation has been seriously interfered with by the rule adopted by the majority members of this committee denying to Mr. Tolerton the right to be present in person or by attorney during the examination of witnesses. Although the resolution called for investigation of serious charges of official misconduct, the privilege of being confronted by the witnesses against him, or subjecting them to cross-examination, a privilege that has always been accorded to persons under such circumstances, was denied to Mr. Tolerton, although persistently requested and insisted upon by him. Yet, notwithstanding the unprecedented, unfair and unfavorable conditions under which this investigation was conducted, no testimony was offered which sustained the truth of the charges referred to in the resolution."

Upon the reports of the investigation of the affairs of relator's office thus made by the committee it is evident that the Legislature adjudged the relator unfit to hold the office of Game and Fish Commissioner and thereupon adopted the proviso, which, in effect, would remove him from the office. It is unnecessary to argue that it was not within the power of the Legislature, nor even the executive branch of the government, to adjudge relator guilty of unofficial conduct and in effect remove him from office. That power is lodged in the courts and when put in motion the accused must be accorded a hearing and a day in court before he can be legally shorn of his rights as was sought to be done by the legislative proviso before us. The facts of this

case, in connection with the alleged investigation and the results which followed in the enactment of the proviso, furnish a strong illustration of the wisdom of our Constitution in providing that "no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others."

VII. In attempting to remove relator from the office of Game and Fish Commissioner and to prevent his reappointment to that office, the proviso under consideration is an encroachment of the legislative department of the government upon the constitutional power of the executive. In the case of State ex rel. v. St. Louis, 216 Mo. l. c. 96, this court said: "Appointments to office are in their nature intrinsically executive acts." And in State ex inf. v. Washburn, 167 Mo. l. c. 696, the court said: "The act of filling a public office by appointment is essentially an administrative or executive act, and, under the Constitution, can be exercised only by an officer charged with the duty of executing the laws. . . . So much of the Act of 1899 in question as attempts to limit the power of the Governor in making the appointment to a choice of persons nominated by the city central committee of a political party, is an unwarranted encroachment on the Governor's constitutional powers."

Section 6557 of the Revised Statutes of 1909 expressly confers on the Governor the power and makes it his duty to appoint a Game and Fish Commissioner to hold office for a term of four years. Section 6 of article 5 of the Constitution of this State makes it the duty, not of the legislative, but of the executive department to "take care that the laws are distributed and faithfully executed." If in the discharge of a duty imposed both by the Constitution and by the law the executive has exercised his prerogative by appointing

to the office of Game and Fish Commissioner a person who in his judgment is faithfully performing his official duty, is it within the power of the Legislature to review the action of the executive and paralyze it by providing in an appropriation act that such appointee shall not receive compensation for his services in such office, although any other person may? If so, then the Legislature may designate, in an appropriation act for the payment of salaries, those who shall and those who shall not be entitled to compensation thereunder, and thus hamper the executive, not only in the exercise of the appointing power, but also in carrying out the mandate of the organic law in taking care that the laws are faithfully executed. Under the authorities cited it is clear that such power has not been granted to the lawmaking branch of the government. The Legislature has the undoubted power to make or to refuse to make an appropriation authorized by the Constitution, and it has the power to create or abolish an office when unrestrained by constitutional limitations, but it has not the power to say who shall not be compensated out of an appropriation for the payment for official services rendered, nor to say indirectly who shall be appointed to or removed from the office thus created.

VIII. The question remains, does the invalidity of the proviso render void the entire section 62, so that no fund can be said to exist in the treasury against which respondent may audit and allow relator's accounts?

It is well recognized that a statute may be void in part and the remainder be sustained as a valid and subsisting law. In State ex rel. v. Taylor, 224 Mo. l. c. 474, this court stated the rule as follows: "The law is well settled in this State that although a statute may be invalid or unconstitutional in part, the part that is valid will be sustained where it can be separated from the part which is void. [State v. Clarke, 54 Mo.

17; State ex rel. v. Field, 119 Mo. 593; Ensworth v.
Curd, 68 Mo. 282; State v. Bockstruck, 136 Mo. 335;
State ex inf. v. Washburn, 167 Mo. 680.]'' In Cooley's
Constitutional Limitations (7 Ed.), page 247, the rule
is more fully stated in the language following: ''If,
when the unconstitutional portion is stricken out,
that which remains is complete in itself, and capable
of being executed in accordance with the apparent leg-
islative intent, wholly independent of that which was
rejected, it must be sustained. The difficulty is in de-
termining whether the good and bad parts of the stat-
ute are capable of being separated within the meaning
of this rule. If a statute attempts to accomplish two
or more objects, and is void as to one, it may still be in
every respect complete and valid as to the other. But
if its purpose is to accomplish a single object only, and
some of its provisions are void, the whole must fail
unless sufficient remains to effect the object without
the aid of the invalid portion. And if they are so
mutually connected with and dependent on each other,
as conditions, considerations or compensations for
each other, as to warrant the belief that the Legisla-
ture intended them as a whole, and if all could not be
carried into effect the Legislature would not pass the
residue independently, then if some parts are uncon-
stitutional, all the provisions which are thus made de-
pendent, conditional or connected must fall with them.''

It is apparent that the purview or body of section
62 under consideration can be separated from the pro-
viso and stand as an entirety, complete and independ-
ent in itself. The fact that it was drafted by the com-
mittee and passed the House, in which it originated,
without the proviso, shows that the body of the act
was not so dependent on the proviso, as embodying
one common purpose only, that the former could not
stand alone without the latter. And if that were the
only consideration involved in the decision of the
point in hand it would be a question of but little dif-

ficulty.  However, the fact that the text or body of the act remaining, after a part has been declared invalid, may be complete in itself, is not alone sufficient to sustain it.  For if the part held invalid is so connected with the residue of the act as to furnish the inducement or compensation or consideration for the enactment of the residue and as to warrant the belief that the Legislature intended them as a whole and would not have passed the part remaining had it known the other part would be held invalid, then the entire act must fall.  Relying upon this principle of law, respondent contends that the proviso "was and is the one condition which induced the General Assembly to appropriate the moneys therein named.  That the Legislature, without the provision contained in said section, would have made no appropriation and that condition constituted the legislative inducement to make the appropriation."  The questions are thus presented whether the proviso was the inducement for making the appropriation and whether the belief is warranted that the Legislature would not have made the appropriation had it known that the proviso would not be carried into effect.

In the consideration of these questions great influence must be given to the duty of the Legislature to make provision for the support of the public institutions of the State.  One of the first and most important questions confronting every form of organized government is that of raising and supplying the necessary funds to meet the legitimate expenses of government, including the support of those public institutions which enlightened sentiment has deemed essential to the general well-being of the people. Under the genius of our system of government and that from which it was evolved, this function has always been regarded as peculiarly within the province of the lawmaking body.  And under our State Constitution the necessity for making such provision for

carrying on the government of the State, more than any other one cause, makes imperative the biennial convening of the General Assembly.

There are many reasons why the Forty-sixth General Assembly must have recognized the importance to the people of the State of making provision for the support of the game department, and the fact that it did appropriate the sum of ninety thousand dollars therefor clearly shows that it did not underestimate the full import of that duty. The last preceding General Assembly had enacted the present game and fish law, and thereby had established an elaborate scheme and an important department of the State for the protection of the wild game and fish of the State and for the propagation of game birds to be distributed among the people. It had authorized the expenditure of two hundred thousand dollars within the period of two years, for carrying out the purposes of the law. Among these purposes was "the buying, shipping, keeping, propagating and preserving of game." Pursuant to the provisions of that law, as shown by the annual report of the Game and Fish Commissioner for the year 1910, of which the court will take judicial notice, there had been invested the sum of $43,880.85 for game birds and eggs, for renting and equipping a game farm and for shipping and distributing the birds and eggs among the people of the State. This sum, together with the expenses of the game department, and the sum of $35,187.32 remaining in the game protection fund unexpended, had been paid into such fund by the hunters of the State as license fees, and upon the faith of the law which provided that the fees so paid should be set aside and constitute a fund for the payment of the expenses of the game and fish department. These facts show not only the importance of making provision for the support of the game department, but that the money was paid and received under a law which required that

the funds be used for that purpose. The disastrous consequences which must necessarily have ensued to the property of the State, including the game birds and eggs on hand, as well as the destruction of the fish and wild game throughout the State, if no appropriation had been made for the support of this department, would have been so serious that it cannot be presumed that such a reckless result was contemplated by the Legislature. On the other hand, the invalidity of and failure to give effect to the proviso could not have been regarded as causing grave consequences. The revenues received, with an exception of no moment, do not pass through the hands of the Game and Fish Commissioner. He cannot draw any part of the funds from the treasury unless his accounts have been approved and warrants have been issued therefor by the State Auditor and paid by the State Treasurer. In addition, the Legislature must have known that if the facts stated in the majority report of the committee were true, then relator could quickly and certainly be removed from office and punished; and in such case the proviso would be unnecessary. These considerations show of how little consequence was the incumbency of the office by relator, compared with the most serious consequences which must have followed a failure to provide for the support of this department. That the Legislature did not contemplate the failure of the appropriation to support the game department is shown by the fact that no provision was made for suspending the receipt of the large revenues coming into the game protection fund, although the game law expressly provides that such revenue shall be used for the support of the game department. These reasons are convincing that the proviso was not the inducement for making the appropriation and in warranting the belief that the Legislature would not have refused to make the appropriation for this department of the State and have left it unpro-

vided for and permitted the State's property to be sacrificed had it known that the proviso would not be carried into effect.

Two cases, because of the similarity of facts and principles of law involved, are persuasive authority in support of the conclusion arrived at in this opinion, namely, State ex inf. v. Washburn, 167 Mo. 680, and State ex rel. v. Carr, Auditor, 129 Ind. 44.

In the Washburn case this court passed upon the constitutionality of an act of the Legislature amendatory of the election law applicable to Kansas City. The act in judgment was intended to secure a bipartisan election board and to that end provided that the three members of the board should be appointed by the Governor, but that one of the three so appointed should be a member of the leading political party opposed to that to which the other two belonged, and should be chosen from a list of three eligible citizens named by the city central committee of such opposed political party. The Governor appointed the three members of the board, and in so doing refused to choose the third member from the list submitted by the city central committee as provided by law, but instead selected as such third member a person not named by the committee. An action was brought to oust from office the third member thus appointed, on the ground that he had been selected in violation of the provisions of the law and therefore was possessed of no valid title to the office. The trial court sustained the proceeding and ordered the respondent ousted, but on appeal to this court the judgment was reversed. This court, speaking through VALLIANT, J., held that so far as the act of the Legislature sought to restrain the executive in the selection of the persons to be appointed, it was special legislation and unconstitutional, and that it was also unconstitutional for the reason that it was an encroachment upon the constitutional power of the Governor in making appoint-

ments. The court also held that although the part of the act providing the manner of making the appointment in order to secure a bi-partisan board was void, the remainder of the act was valid, and the court upheld the appointment made by the Governor contrary to the express requirements of the law.

In the case of State ex rel. v. Carr, supra, there were two claimants for the office of chief of the bureau of statistics, Worrell, appointed by the Governor, and Peelle, selected by the Legislature. The Legislature made an appropriation for the support of the bureau of statistics and added a proviso that the funds so appropriated should be paid to ''William A. Peele, Jr., and to no other person or persons.'' The act also made it a felony for the Auditor to draw a warrant on the fund so appropriated in favor of any other person than as named in the act, and also made it a felony for the State Treasurer to pay the funds so appropriated other than as provided in the act. It was finally decided in the courts that Worrell was entitled to the office of statistician and in a mandamus proceeding against the Auditor, for the audit and allowance of his salary, the Supreme Court of Indiana held the proviso of the act invalid, sustained the residue of the act making the appropriation and ordered the peremptory writ to issue.

For the foregoing reasons we hold that relator is entitled to the audit and allowance of his accounts and that warrants should have been issued therefor as requested. We therefore sustain the order granting the alternative writ and direct the issuance of a peremptory writ as prayed.

*Lamm* and *Ferriss, JJ.*, concur, *Brown, J.*, concurs except as to paragraph one, from which he dissents; *Graves, J.*, concurs in a separate opinion; *Valliant, C. J.*, dissents in separate opinion in which *Woodson, J.*, concurs; *Woodson, J.*, dissents in separate opinion in which *Valliant, C. J.*, concurs.

## SEPARATE CONCURRING OPINION.

GRAVES, J.—I concur in most that is said by our brother KENNISH in this case, but for reasons somewhat different. Owing to this situation I prefer to concur in the result of his opinion, and express my own reasons for so doing.

I have no question that a right conclusion has been reached in view of what this court has heretofore said upon what I conceive to be a vital question in this case. Before going to the merits of the particular case, a few general observations may not be *malapropos*. The question is one of most serious moment. It suggests the idea whether the Legislature can do by indirection a thing which it could not directly do. The case should be stripped of all matters, except pure questions of law. If the rider placed upon the bill under consideration is valid exercise of the legislative function, then the Legislature can absolutely stop the wheels of State, because the members thereof have conceived a dislike to some worker in the several departments. If this rider or proviso is valid, then the Legislature could stop the Auditor's office until such time as the Auditor appointed deputies to the liking of the Legislature. The Legislature could say that they would appropriate so much for the support of such department provided none of such appropriation should be used so long as John Jones was a clerk in such department. Yet, under the law, the Auditor has the right to select his own assistants. He is responsible for their conduct, whether good or bad, and for such conduct he must answer. If his assistants are satisfactory to him, the head of the department, why should the Legislature have the right to stop all work in that office until such time as the Auditor should discharge the offensive employee? If such a law was passed and the work of the State thus retarded, the

236 Sup.—12

seriousness of the situation would be such as to retire every member of the Legislature lending support to the measure.   The business of the State and the enforcement of its laws should not be dependent upon the petty whims of individuals or a combination of individuals, but should be dependent upon broad statesmanship.

It is begging the question to say that such a proviso does not oust the censured party from office.   If there had been a proviso similar to the one in hand attached to the appropriation to the Auditor's office, providing that none of such appropriation should be used for the purposes of the State so long as the present incumbent remained in office, it would not have been more objectionable than the one now before us. No officer can afford to serve the State without the pittance allowed by law.   No officer can get clerks and other assistants without the assurance that there is cash with which to pay them.   With an appropriation subject to a proviso of the kind in question, it is trifling with words and trifling with common sense and common experience to say that the officer has not been removed from office.   Technically, he has not by direct words been removed, but when the lifeblood is sapped from the body death ensues.   When the tap root is severed, the tree dies.   When the expenses of a department of the State are stopped with the indications apparent upon the face of this bill, the offices of that department are in effect vacant.   The head of no department can afford to work and in addition pay the expenses of his department.

In addition to this, the precedent is bad.   Let such a proviso be upheld and the end is not in sight.   It opens the field for partisanship rather than statesmanship to administer the affairs of State.   It opens the field for one party to make reprisals from the other.   The theory is not only dangerous, but one to be condemned.

State ex rel. v. Gordon.

To my mind the question facing this court is the most serious ever heretofore presented. The game department may be small and insignificant as compared to others, but the questions involved in this controversy affect all, and their seriousness bespeaks a most careful consideration.

It may be and should be conceded that the Legislature can refuse to appropriate at all·for the maintenance of any or all departments, yet that does not meet the question here. If such department boldly, bluntly and willfully refuses to sustain the other departments of State, the only remedy is the good conscience and judgment of their constituents. But that is not the vital question here. In this case the Legislature determined that their game laws should be *enforced*. They determined that the appropriation should be made, but to that appropriation they tacked on a proviso which strikes at the powers of another department. In the body of the bill the appropriation is made, but by the proviso they undertake to say to the Governor there is one man whom you cannot select to enforce these laws. This, we think, under our own holdings, is beyond their power, a matter we more fully discuss presently. There are but two real questions in this case to my mind, and they are, (1) is this proviso valid, and (2) if not, can it be severed from the act, and leave a completed and good bill or law.

These questions I shall take in order.

I. That our Constitution contemplates three separate and distinct departments of government is not questioned. That one cannot seriously interfere with the other is not questioned. There should be at least a spirit of comity between the three, and the one should not undertake to trespass upon the powers and duties of the others. Personally, I have always thought that in statutory offices the Legislature could within reasonable bounds, and for the general good, place some

restrictions upon the Governor in the matter of making appointments to these statutory offices. As the trial judge upon the circuit, in the case of State ex inf. v. Washburn, 167 Mo. 680, I entertained such views, but my views were not adopted by this court, and if that case is controlling in this, as I think it is, I hardly think this the time or place to overrule it, if it be wrong. Let it be overruled with proper dignity in a cause devoid of questions which can clearly be read between the lines in this case. But I repeat that I have not changed my original views in the Washburn case. Personally, I have gone further and conceded that the Legislature can make some reasonable limitations upon powers of this court. *Vide* dissenting opinion in Railroad v. Gildersleeve, 219 Mo. l. c. 185-202. Nor have I changed my views upon this question. In neither case have my individual views been adopted by the court, and in the case at bar I feel constrained to follow the law just as it has been heretofore written. Under the Washburn case this proviso is invalid. To my mind the Washburn case cannot be read out of this case by saying that the question was different. A vital question of that case was the right of the Legislature in creating an office to place restrictions upon the appointive power of the Governor. As above stated I thought then and I think now that reasonable restrictions in the interest of good government may be made, but such was not the views of this court. The law under consideration in the Washburn case undertook to limit the appointive power of the Governor by saying that he should select one officer out of three names presented to him by a certain designated city committee. Speaking of that question in the Washburn case, we said:

"There is another constitutional standpoint from which this case should be viewed, and from which the Act of 1899, in question, is equally indefensible. By article 3, it is ordained as follows: 'The powers of

government shall be divided into three distinct departments—the legislative, executive and judicial—each of which shall be confided to a separate magistracy, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this Constitution expressly directed or permitted.'

"All governmental powers are in their natures either legislative, executive or judicial. The Constitution does not undertake to define what acts fall within one class or the other, but leaves every act to be classified according to its nature, recognizing that the essentials which distinguish those that belong to one department from those that belong to the two others, are discernible to the learned mind. But in that article of the Constitution all the powers of the State government are disposed of, and every one who lawfully exercises any State governmental function is able to trace the source of his authority to one of the three departments there named. The power, whatever its character, can be exercised only by or under authority of the separate magistracy to which by the Constitution it is assigned.

"The election commissioner is an officer who exercises an important function of the State government, affecting not alone the city in which his duties are performed, but the whole State. He fills, therefore, in its full sense, the definition of a public officer. He is not a State officer within the narrow meaning of that term as used in section 12, article 6, which confers jurisdiction on this court in cases in which a State officer is a party, but he is an officer of the State in the sense that a sheriff or a circuit clerk is an officer of the State. [State ex rel. v. Dillon, 90 Mo. 229; State ex rel. v. Bus, 135 Mo. 325; State ex rel. v. Higgins, 144 Mo. 410.] A public officer exercising a

function of the State government is an agent or ser-
vant of the sovereign people of the State, and must
derive his authority either by election by the people
or appointment by that tribune to whom the people
have confided the power of appointment. It is there-
fore necessary that he should trace his title to the
office to the department of the State government to
which, under article 3 above quoted, the power to con-
fer title to such an office is committed.

"But suppose, when called into court to show by
what authority he holds the office, he shows that he
has been appointed by the city central committee of
his political party, to what department of the State
government would we charge the appointment? It may
be said, however, that the committee is not to make
the appointment, it is to be made by the Governor.
If the Governor of his own free will makes the ap-
pointment, even if he selects one of the three nomi-
nated by the committee, it is his appointment and the
appointee may truly say that he holds by appointment
under the executive department. But we are con-
cerned now with the question of the power of the Leg-
islature to compel the Governor to make the appoint-
ment from one of the three named by the committee
and we are asked to say that the Governor, by force
of this act, cannot do otherwise than register the will
of the committee.

"If that is the law, then, in reality, what would be
the source of an appointment under it?

"We are referred to section 9 of article 14 of the
Constitution which is: 'The appointment of all officers
not otherwise directed by this Constitution shall be
made in such manner as may be prescribed by law.'
And it is contended that that section confers authority
on the General Assembly for this act. That section
expressly authorizes the General Assembly, acting
within its legislative capacity, to pass a law prescrib-
ing the manner in which an appointment shall be made,

but it does not authorize the General Assembly to make the appointment itself, nor authorize anyone unconnected with the government to do so. To provide by law the manner in which an appointment shall be made is one thing, to make the appointment is another; the one is in its nature legislative, the other is essentially executive. The Constitution authorizes the Legislature to do the one, but not the other.''

It is argued that this proviso does not attack the executive power. Directly, it perhaps does not, but indirectly it says to the executive department that (1) you must have Tolerton resign, in order that the laws may be enforced, and (2) that you cannot reappoint Tolerton. Suppose Tolerton should resign to-day, and then the Governor undertook to reappoint him to the place, would there not be a restriction upon the free will of the Governor to make such appointment? We think so. Suppose we go further and suppose that the Legislature was creating for the first time the office of Game Warden, and in that bill provided that the Governor should appoint such officer, but by proviso limited his appointive power so that Tolerton could not be appointed, would such proviso be valid under the Washburn case? We think not. If by proviso they could exclude one man from the consideration of the Governor in making the appointment, they could exclude more than one. If they could exclude more than one, they could exclude all but one, and in this way make their choice the choice of the Governor.

To my mind under the views expressed in the Washburn case there is no doubt that this proviso treads upon the power of the executive department, and is violative of the constitutional provisions pointed out in the Washburn case, supra.

Even under the view that the Legislature can make reasonable restrictions upon the power of the Executive Department, yet it would be doubtful whether this could be called a reasonable restriction. At any rate

if a public official has been derelict in duty, the law affords ample means to get rid of him, but his case is not to be tried before the Legislature. I am firmly convinced that this proviso, and provisions of this character, are not only invalid, but that they should be promptly condemned by the courts in the interest of reasonable comity and harmony between the different departments of State. The general tendency of such legislation is bad.

II. Can this proviso be rejected and leave a valid law? This question is likewise fully answered by the Washburn case, supra. The act in question in the Washburn case so far as material, reads: "There is hereby created a board of election commissioners for each city that is governed by the provisions of this act, composed of three members, who shall be appointed as follows: Within ten days after this act takes effect, the Governor shall appoint three election commissioners, one of whom shall be by him designated as the chairman of the board, and one of whom shall be by him designated as the secretary of the board, which said three election commissioners shall hold their offices for the term of three years, and until their successors are appointed and qualified . . . One of said election commissioners so appointed by the Governor shall be a member of the leading party politically opposed to that to which the chairman and secretary so appointed belong and shall be chosen from three eligible citizens named by the city central committee of the said leading party politically opposed to that to which the chairman and secretary belong." This was the Act of 1899. [Session Laws of 1899, p. 197.]

This court held the latter clause invalid, yet it said there was a good law left, and Washburn should be reinstated in office, although appointed in violation of the last clause of the law. Upon there being a valid law left, after having severed therefrom this emphatic

clause, we then said, at page 697: "The point is advanced that if the Act of 1899 is unconstitutional in the particular named, the whole act is void and the incumbent has no title to the office. The power attempted to be conferred on the partisan committee is not an essential element in the whole act. Where the part of an act that is unconstitutional does not enter into the life of the act itself, and is not essential to its being, it may be disregarded and the rest remains in force; that is this case. The record shows a perfect title in appellant to the office in question, and, therefore, the judgment of the circuit court is reversed."

In that case we went to the very bowels of the act and cut out a member. Can it be said in the face of that ruling that the invalid proviso in this law cannot be lopped off, and yet leave a valid law? In the Washburn case we carved from the very heart of the act, and yet said that which was left was a good law. In so doing we may have been right, although I am not committing myself to that rule, but whether right or wrong it is the rule last announced in cases of this character. There is just as much reason in saying that the Legislature would not have passed the Act of 1899, supra, without this clause stricken therefrom, as to say that the Legislature would not have passed the act under consideration without the proviso. If we revert to history and conditions, one was just as much the fixed intent of the Legislature as the other. In the Act of 1899, the Legislature had the fixed intent of trying to get fair elections by having at least one active partisan on the Board of Election Commissioners, who was opposed politically to the powers that be at Jefferson City. It was reasonable, because we all know that it requires the activity of opposing partisans (if we may use that word) to insure absolutely fair elections. The intent of the Legislature was at least clearly fixed and pointed out in the Act of 1899,

as in the one in question. The Act of 1899 was at least commendable in its purposes and designs. From it, however, we carve out one of the vital things in the minds of the legislative body and say enough is left to make a good law. Can we, or should we do less in this instance? I say not, and repeat that if the doctrines of the Washburn case are to be overruled upon either of the questions argued, it should come under different surroundings. For these reasons I think the writ should go, and for these reasons I concur in the result reached in the majority opinion.

*Lamm* and *Ferriss, JJ.*, desire to be marked as concurring in these views as well as those in the principal opinion.

## DISSENTING OPINION.

VALLIANT, C. J.—I am unable to concur in the opinion approved by the majority of the court in this case, and since there are important questions affecting the respective powers of the three departments of the State government to be decided, I feel constrained to state, as briefly as I can, my reasons for dissenting.

There is no more important provision in the State Constitution than that contained in Article III, which creates three departments of the State government, assigns to each a particular part of the powers of government and forbids it to exercise any power properly belonging to either of the others, "except in the instances in this Constitution expressly directed or permitted." The departments named are "the legislative, executive and judicial." And the greatest of these is the judicial. This is so because the judicial has authority to hold the two other departments in their respective places and to declare the act of one illegal when it has usurped the power of the other; but if the judicial department should usurp "power

that properly belongs to either of the others," there is no redress for the wrong. This great power is intrusted to the judicial department, because ultimate power must be confided to some tribunal and the people, who are the source of all power, have seen fit to confide it to the judicial department, trusting to its learning, its ability, its impartiality and its sense of justice. Therefore, it especially behoves the judicial department, when passing judgment on the act of a department which is charged as a usurpation of the powers of another, to be careful itself not to usurp legislative or executive power, yet that in my opinion is exactly what we are doing in this case. To the credit of this court it is to be said that whenever it has been called on to pass judgment on a question of the validity of an act of either of the other departments of the State government, it has approached the subject with great caution, with great respect for the department whose act is in question, and has never declared the act invalid unless it was so clearly in violation of a particular clause in the Constitution that no other conclusion could be reached. In the brief of the Attorney-General in this case is a list of cases that justify what I now say, and I refer to those cases. The General Assembly is absolute in its power to make laws for the State, except only as limitations on that power are placed in the Constitution of the State or that of the Federal government; and when we undertake to say that an act of the Legislature is invalid, we should be able to put our finger on the clause in the Constitution that forbids it. If a court should pronounce a statute invalid because it is deemed to be unwise, unjust or impolitic, the court would convict itself of usurping legislative functions. Very clearly in the judicial history of Missouri this court expressed itself in clear language on this subject. [Hamilton v. St. Louis County, 15 Mo. 5.] In that case the court was asked, in passing on the question of the validity

of a statute, to take into consideration the fact that the act was passed upon the petition and urgent solicitation of many of the citizens of the county and received the unanimous support of the representatives of the county, but the court said that it could take into consideration only the limitations on the power of the General Assembly imposed by the Constitution; it said: "The Declaration of Rights which furnishes limitations upon the powers to be exercised by all departments of the government, is a comprehensive declaration of the great principles upon which rest our political, civil and religious freedom, and our social and individual security. The invasion of these principles, by any functionary of any department of the government, is as much a violation of the Constitution as if they were written out in the form of the most imperative prohibition. Yet, when all this is stated, it still remains true, that no court is authorized to declare an act of the Legislature void without being able to point out some specific clause of the Constitution to which it is repugnant. Within the limits thus allowed for the action of the different departments of government, much injustice may be practiced and much wrong done, for which there is no remedy." Then after further discussion of the subject the court said: "When we turn now to the consideration of the act in question, its injustice is apparent, upon its own face. . . . The wrong done the county is palpable, but with this admitted, the constitutionality still remains untouched." And in concluding the opinion the court said: "If, in listening to the voice of the people, speaking through the Constitution, we had found one utterance prohibiting the passage of this act, we would cheerfully have rendered that prohibition effective, but we are not at liberty to give our judgment of expediency, or of even justice, a controlling power over acts of the General Assembly. Our duty, then, alone remains for us to perform, and that is to enforce the

law.'' The court in that case laid down the law for the government, not only of the executive and legislative departments, but for the judicial department also, and this court has never departed from the conservative doctrine there declared. And this court has also in many cases held that an act of the General Assembly should not be adjudged invalid unless its invalidity should appear beyond a reasonable doubt. Among the latest of these so holding is State ex rel. v. McIntosh, 205 Mo. 589.

As I understand the position of the relator as announced in the oral argument and brief of his learned counsel it is claimed that the proviso in the statute of which they complain is invalid, first, because the fund out of which the relator seeks to be paid is not within the power of the General Assembly, does not belong to the State, was not raised by taxation, but by license fees paid by the hunters, raised for the sole purpose of maintaining the game laws by which it is automatically continually appropriated, and no appropration by the General Assembly is necessary; second, because it is an attempt of the legislative department to usurp power that properly belongs to the executive, that is, to infringe upon the power of the executive to appoint a game commissioner; third, that it amounts to a repeal or amendment of the game law, or an attempt to force the resignation of the Game Warden when no such purpose is indicated in the title to the bill; fourth, that it is an unjust, unwise and vicious statute, setting a dangerous precedent, and leading to dire results.

I. As to relator's first point I do not deem it necessary to say more than refer to the game law itself, which requires the money collected for hunter's licenses to be paid into the State Treasury, and then refer to section 43, article 4, of the Constitution which is: ''All revenue collected and moneys received by the

State from any source whatever shall go into the treasury, and the General Assembly shall have no power to divert the same, or to permit money to be drawn from the treasury except in pursuance of regular appropriations made by law.''

''All revenue collected and moneys received by the State from any source whatsoever'' shall go into the State Treasury and can be withdrawn only by an appropriation made by the General Assembly. How it can be seriously contended that the money from this source which has gone into the treasury can be withdrawn without an appropriation I am unable to see.

II.  Since the appropriation was necessary, and the Constitution leaves it to the General Assembly to make it, the General Assembly can make it for as much or as little as it sees fit and may impose what conditions it sees fit to impose and specify the purposes for which it may or may not be used and no other department can interfere with the exercise of that power, whether it be exercised wisely or unwisely. Suppose the Legislature should be satisfied that money appropriated to support the office of Game Warden and to take care of the State's property, intrusted to him, would be misused and for that reason refuse to make any appropriation at all, what could either of the other two departments do? If the game laws would go unenforced, and the State's property perish or go to ruin, because there was no appropriation, the responsibility would be on the General Assembly, and the General Assembly might be subject to reproach for failure to perform its duty, but could it be said that the General Assembly had violated the Constitution by interfering with the Governor's right to appoint the Game Warden, or by forcing the Game Warden to resign, or by indirectly repealing the Game Law, and therefore the judicial department may take the matter in hand and require the Auditor to draw a

warrant on the State Treasury to be paid out of the Game Protection Fund? There is no difference in the legal effect between refusing to make any appropriation at all because of mistrust of the incumbent, and making an appropriation on condition that it should not be used while he is in office, or while he has charge of its affairs, and the court is as powerless to require the Auditor and Treasurer to draw the money out of the State Treasury in such case as it would be to compel the General Assembly by mandamus to make the appropriation. If the Legislature should distrust the incumbent in the office of Game Warden whom the Governor had appointed, and for that reason refuse to make any appropriation, would that be interfering with the Governor's power to appoint? And suppose even the refusal to make an appropriation should be with the purpose, on the part of the General Assembly, to force the resignation or removal of the officer, can the judicial department take the matter up and give relief? There is no difference in effect between refusing to make an appropriation because of distrust of the officer in charge, and making an appropriation on condition that it shall not be used while that official is in office; the one is no more an interference with the Governor's power to appoint than the other, and is no more liable to force the resignation of the officer than the other, and if the one is unwise, unjust or impolitic, the other is equally so; if one leaves the game unprotected and the State's property liable to go to destruction, the other is equally so, there is no difference. No department of the State government can lawfully authorize the withdrawal of a dollar from the State Treasury except the General Assembly, and it can be withdrawn only on the terms and conditions prescribed by the General Assembly, let the consequences be what they may. When we say that the proviso attached to this appropriation may be set at naught and the appropriation be used in defiance of

the express words of the statute, we lay a limitation on the power of the General Assembly that the Constitution has not laid; we say to the General Assembly: You may make appropriations, but you shall not make conditions on which the money or any part of it shall be used, and we usurp power that has been given to the legislative department only. Better the game be unprotected and the rare birds that have been gathered, scattered, than that either the executive or the judicial department should invade the province of the legislative department and usurp powers that have been entrusted to it alone. The *proviso* which the relator claims to be unconstitutional does not interfere with the Governor's power to appoint, or legislate the relator out of office; the Governor has made the appointment and the appointee is still in office and may hold it until his term expires, but he is embarrassed for lack of funds as any officer may be for whom the General Assembly refuses to make an appropriation or makes an appropriation that is unavailable. A somewhat *ad hominem* argument is made by the learned counsel for the relator to the effect that if the General Assembly be allowed to make an appropriation for the office of Game Warden on condition that it should not be used while the present incumbent is in charge of the office, it might with equal right make an appropriation for the support of this court on condition that it should not be used while certain members of the court remain in office. That is so. But suppose the Legislature should do that, it would not justify the court in using its process to compel the Auditor and the Treasurer to pay the money contrary to the terms of the appropriation. The Legislature may refuse to make any appropriation to pay the judiciary, yet there would be no help for it. The General Assembly alone has the power to appropriate money out of the Treasury, and it alone is responsible to the people for what it may do or fail to do in the exercise of that power.

It may specify for what purposes the money appropriated shall be used and for what it shall not be used. In the General Appropriation Act passed by the last Legislature appropriations were made for the contingent expenses of the several departments of the State government, and in each instance the purposes for which the money could be used were specified. The specification of the purposes for which it could be used was equivalent to saying it should not be used for any other purpose. Among the appropriations thus made was one for the contingent expenses of the Governor's office, and one for those of the Supreme Court; as to those appropriations the Governor had power to either approve and sign the bill or strike them out; he could not strike out the specifications and leave the appropriations standing, nor has he authority to strike out the conditions on which an appropriation is made and leave the appropriation standing. The proviso in question is a condition on which the money appropriated can be used, and if those persons interested in the enforcement of the game law do not wish to observe the condition, they are in the same condition they would be in if no appropriation at all had been made. Relator refers to the case of State ex inf. v. Washburn, 167 Mo. 680, to sustain his theory that the General Assembly, by adding this condition to the appropriation, interfered with the power of the Governor to appoint the Game Warden. I can see very well how the failure of the General Assembly to make an appropriation that would be available to the relator might embarrass him in the practical performance of his duties, but how it could effect the Governor in the exercise of his constitutional power I am unable to see. The Washburn case referred to has no point in common with this. In that case the Governor had to appoint an election commissioner and the General Assembly undertook to limit his choice to one of three

persons to be named by a political committee; it was
held that the General Assembly could not so curtail
a power that belonged to the Governor.  But there is
no such principle involved in this case; the Governor
has made his appointment, the appointee is in office
and no one questions his right to hold it, he is embar-
rassed perhaps for lack of money but to supply that
want is not the power of this court.  We are referred
also to Ex parte Lucas, 160 Mo. 218, where the Legisla-
ture had made a limitation somewhat similar to that
in the Washburn case on the power of the Governor
to appoint, but in that case it seems that the Gov-
ernor acquiesced in the limitation put on his power
and made his appointment in conformity therewith.
There is nothing in either of those cases that has any
resemblance to this.  In the case at bar, instead of
the General Assembly attempting to infringe upon the
powers of the Governor, if the effort of the relator
to have the statute so amended, by the executive and
judicial departments, as to strike out an important
clause and thereby give it an effect the opposite to
what the law-makers intended, is to succeed, it would
be a palpable invasion of the province of the legisla-
tive department.

The Governor's power in reference to the making
of laws is limited to approving or disapproving a bill
as it comes to him from the General Assembly; he has
no authority to amend it or to approve a part and thus
make that part a law and disapprove another part and
thus make that part not a law.  There is but one ex-
ception to what I have just stated and that is con-
tained in section 13, article 5, of the Constitution, and
is in these words: ''If any bill presented to the Gov-
ernor contain several items of apprpriation of money,
he may object to one or more items while approving
other portions of the bill.  In such case he shall ap-
pend to the bill, at the time of signing it, a statement
of the items to which he objects, and the appropriations

so objected to shall not take effect:'' It is only the
''item'' of the appropriation to which he may object,
''and the appropriation so objected to shall not take
effect.'' That clause does not give the executive the
power to approve the item and disapprove the condi-
tion on which it is appropriated; as well might it be
contended that he had the power to approve the item,
but disapprove the purpose for which it was appro-
priated and devote it to another purpose. No one can
read this section 62 of the General Appropriations
Act and not understand that if the money appropri-
ated be used to pay the salary of the present incum-
bent and expenses incurred under his direction, it will
be used contrary to the intention of the lawmakers as
expressed on the face of the act. There are other pro-
visions in that section limiting the use of the money;
as for example, that not more than one-half of the
amount shall be used in one year, etc.; as well might
we say that those other conditions may be disregard-
ed as the one now questioned.

As to the point that this *proviso* is in conflict with
section 28, article 4, because its purpose is not ex-
pressed in the title, I have only to say that if the title
to a general appropriation act must express every
condition which is attached to an appropriation, then
there has perhaps not been a valid general appropria-
tion act passed since the Constitution was adopted.

III. But whatever difference in opinions there
may be as to the validity of the proviso in question,
I apprehend there are no two opinions on the proposi-
tion that the intention of the lawmakers in reference
to that appropriation was expressed in that proviso,
and that the appropriation would not have been made
without it. That being so, if we strike out the proviso
we must strike out the whole appropriation, because
the court has no lawful power to apply the money to
a purpose to which it was not appropriated. In con-

struing a statute we must find from its whole face what the intention of the lawmakers was. If we find that the purpose of the Legislature cannot be carried out because it is in conflict with the Constitution, we cannot by judicial amendment change the act to accomplish a different purpose, or as in this case, not only a different purpose, but a purpose the very opposite of that intended by the lawmakers. This court, perhaps, has the power to do so, because it has the last word, but in doing so it would make a different statute from that made by the Legislature. I am not disputing the proposition that a statute may be unconstitutional in part and valid in another part, and when the invalid can be taken out without doing violence to the main purpose of the lawmakers, leaving the valid to stand, the courts may do so, but that can only be done when the part of the act that is left still expresses the will of the lawmakers. I know of no case where the court has so pruned a statute, by cutting off its unconstitutional features, as to convert it into an act to acomplish the very opposite purpose of that intended by the Legislature, as such purpose is shown in the face of the act, taking it altogether, the good and the bad. Even if the Legislature had intended to do what it had no right to do, we have not, for that reason, lawful power to make it do what it did not intend to do. It did not intend to appropriate any money to pay the salary of this relator or expenses incurred by him, and if we compel the Auditor to issue warrants to him for those purposes, it will be the court, not the General Assembly, that makes the appropriation.

Reference is made to State ex rel. v. Carr, 129 Ind. 44, as sustaining relator's position, but that case is essentially different from this. There an appropriation had been made for the support of the office of the Indiana Bureau of Statistics, including the salary of the chief. After making the appropriation and spe-

cifying the purpose for which it was made, "to be paid out on the itemized and qualified bills of the chief of the bureau of statistics," the act continued: "The several sums so appropriated by this act for the said bureau of statistics shall be paid to William A. Peele, Jr., Chief of said bureau elected by this General Assembly," etc. The Governor had made an appointment of a chief and the General Assembly had elected another one, to-wit, the man Peele. The court held that the man appointed by the Governor, and not the man elected by the General Assembly, was the *de jure* officer, and entitled to the salary. It was a contest as to which of the two, the man appointed by the Governor and the man elected by the General Assembly, was entitled to the office and salary incident thereto. Interpreting the clause in the act which required the money to be paid to Peele the court said: "The clause relating to Peele evidently was inserted upon the theory that he was the legal officer." And the court concluded that it was not the intention of the General Assembly to divert the salary from the *de jure* officer. The court said that to impute to the General Assembly the intention to provide that the person chosen by it should hold the office right or wrong would be to attribute improper motives to its members. The court said: "Certainly such was not the intention of the Legislature, and the act would be absolutely void if it was." It was on that theory that the Indiana court held that it could disregard the clause in reference to Peele as unconstitutional and still carry out the intention of the Legislature by retaining the rest of the act. But no one can say that our General Assembly made a mistake in fact as to who was the *de jure* Game Warden, or that it intended any of the money appropriated to be available while he was in office. Therefore, if we strike out the part that we may think is unconstitutional and retain the rest we cannot say

that in so doing we are carrying out the intention of the General Assembly.

Reference is made to the case of State ex rel. v. Mason, 153 Mo. 23, as authority for relator's contention that this court may by its writ of mandamus compel the Auditor to draw his warrant for the amount demanded, notwithstanding there may be no appropriation. But that case is no authority for that proposition. In the first place that case did not relate to money in the State Treasury; therefore it was not governed by section 43 of article 4, which forbids the withdrawing of any money from the State Treasury except pursuant to an act of the General Assembly making the appropriation. Besides, the act of the Legislature on which that case depended made it the duty of the city auditor to draw warrants, under the condition then existing, payable out of any money in the city treasury not otherwise appropriated. And furthermore the municipal assembly had made an appropriation which the court held was available for the payment of the relator's claim.

Reference is also made to Ex parte Lucas, 160 Mo. 218, but that case has no bearing on the question here, because that did not relate to money that had gone into the State Treasury.

IV. In their conclusion the learned counsel say: "Aside from the various propositions heretofore discussed, the proviso attached to said section 62 cannot be sustained upon elementary principles or from the standpoint of public policy." Then after showing how even this court might be disrupted by that kind of legislation if tolerated and if the General Assembly should be so minded, they say: "This proviso, upon the broad ground of public policy, is vicious on its face, and, in our opinion, should not for a moment be sustained." Counsel then make a strong plea in behalf of "the hunters of the State whose rights have

been ignored'' and who have ''paid their money into the State Treasury for the purpose of having the game laws enforced,'' and they say, ''In conclusion we ask the court to hold not only that the proviso above mentioned is utterly void, but, in order that future legislatures may not misappropriate the special fund raised by the hunters of the State to enforce the game law, to directly declare that no part of said fund can be appropriated by the Legislature to any other use except for the enforcement of the game law of the State; or, in other words, that no part of the Game Protection Fund can be treated as revenue raised by taxation and paid into the general treasury of the State for ordinary State purposes.'' So far as my research into the cases have shown, that is the first earnest appeal that has ever ben made to this court to declare an act of the General Assembly unconstitutional because it is contrary to public policy and to convert the act by a process of pruning into something the very opposite to what the General Assembly enacted. *Woodson, J.,* concurs in the views expressed in this opinion.

## SEPARATE DISSENTING OPINION.

WOODSON, J.—I dissent from the majority opinion herein, and concur in the dissenting opinion of our Chief Justice, for the reasons stated by him therein.

In thus dissenting from the majority opinion and concurring in the minority, I wish to add that both opinions concede that, if the Legislature had made no appropriation for the use of the State Game Department, then the courts would be powerless to grant the relief asked, for the reason, that to hold otherwise would have the effect to take money from the Treasury without an appropriation, which is prohibited by an express provision of the Constitution. That being

unquestionably true, then it seems clear to my mind that the relief here sought should be denied for stronger reasons, namely, that in this case there is not only no appropriation made for the use of Mr. Tolerton, but upon the other hand, there is an express provision of the act withholding all sums from him.

It will not do to say, as the majority opinion does, that this provision is void because it is a special law, as regards Mr. Tolerton, for the obvious reason that all appropriations under section 43 of article 4 of the Constitution must be special. That section after enumerating six specific objects of appropriation, provides: "Seventh, For the pay of the General Assembly, *and such other purposes not herein prohibited* as it *may deem necessary.*" It is not only the letter of the Constitution that appropriations must be special, but it is the common sense of it. Suppose for instance, the State owed John Jones $100, for some special service performed; how could he be paid except by a special appropriation? It could be done in no other manner; and that is the way that such claims have always been paid. [See Laws 1909, pages 78 to 91; Laws 1911, pp. 4 to 73, and previous acts.] In the Laws of 1911, there are probably between fifteen hundred and two thousand of such special appropriations.

If under that constitutional provision the Legislature can make special appropriation in favor of named persons, what then is there contained in that, or any other provision, which would prevent the Legislature, by special appropriation to exclude a party named from the use of the appropriation so made. Now I submit, the one is no more special than the other. *Valliant, C. J.,* concurs herein.